# FREEMAN, TRUSTEE, *v.* HEWIT, DIRECTOR OF GROSS INCOME TAX DIVISION.

No. 3.   Argued November 8, 1944.   Reargued October 14, 1946.—
Decided December 16, 1946.

*Gath P. Freeman* argued the cause for appellant and filed a brief on the original argument, and also filed a brief on the reargument.

*Harry T. Ice* reargued the cause and filed a brief for appellant.

*Winslow Van Horne,* Deputy Attorney General of Indiana, argued the cause on the original argument for appellee. With him on the brief were *James A. Emmert,* Attorney General, *John J. McShane,* Deputy Attorney General, *Robert Hollowell, Jr., Cleon H. Foust, John H. Fetterhoff* and *Fred C. McClurg.*

*John J. McShane,* Deputy Attorney General, reargued the cause for appellee. With him on the brief were *James A. Emmert,* Attorney General, *John H. Fetterhoff* and *Fred C. McClurg,* Deputy Attorneys General.

Mr. Justice Frankfurter delivered the opinion of the Court.

This case presents another phase of the Indiana Gross Income Tax Act of 1933, which has been before this Court in a series of cases beginning with *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307. The Act imposes a tax upon "the receipt of the entire gross income" of residents and domiciliaries of Indiana but excepts from its scope "such gross income as is derived from business conducted in commerce between this state and other states of the United States . . . to the extent to which the State of Indiana is prohibited from taxing such gross income by the Constitution of the United States." Indiana Laws 1933, pp. 388, 392, as amended, Laws 1937, pp. 611, 615, Burns' Ind. Stat. Anno. § 64–2601 *et seq.*

Appellant's predecessor, domiciled in Indiana, was trustee of an estate created by the will of a decedent domiciled in Indiana at the time of his death. During 1940, the trustee instructed his Indiana broker to arrange for the sale at stated prices of securities forming part of the trust estate. Through the broker's New York correspondents the securities were offered for sale on the New York Stock Exchange. When a purchaser was found, the New York brokers

notified the Indiana broker who in turn informed the trustee, and the latter brought the securities to his broker for mailing to New York. Upon their delivery to the purchasers, the New York brokers received the purchase price, which, after deducting expenses and commission, they transmitted to the Indiana broker. The latter delivered the proceeds less his commission to the trustee. On the gross receipts of these sales, amounting to $65,214.20, Indiana, under the Act of 1933, imposed a tax of 1%. Having paid the tax under protest, the trustee brought this suit for its recovery. The Supreme Court of Indiana, reversing a court of first instance, sustained the tax on the ground that the *situs* of the securities was in Indiana. 221 Ind. 675, 51 N. E. 2d 6. The case is here on appeal under § 237 (a) of the Judicial Code, 28 U. S. C. § 344 (a), and has had the consideration which two arguments afford.

The power of the States to tax and the limitations upon that power imposed by the Commerce Clause have necessitated a long, continuous process of judicial adjustment. The need for such adjustment is inherent in a federal government like ours, where the same transaction has aspects that may concern the interests and involve the authority of both the central government and the constituent States.[1]

---

[1] Compare Report of the (Australian) Royal Commission on the Constitution (1929) pp. 260, 322–24, and Report of the (Canadian) Royal Commission on Dominion-Provincial Relations (1940), bk. II, pp. 62–67, 111–21, 150–62, 216–19. See Australia, Act No. 1, 1946, repealing Act No. 20, 1942, and Act No. 43, 1942; *South Australia* v. *Commonwealth*, 65 C. L. R. 373; also Proposals of the Government of Canada, Dominion-Provincial Conference on Reconstruction, pp. 47–49; Proceedings of the Dominion-Provincial Conference (1945) *passim*, particularly the statement of Prime Minister Mackenzie King, p. 388, and the discussion following. And see Maxwell, The Fiscal Impact of Federalism in the United States (1946) cc. II, XIII, XIV.

The history of this problem is spread over hundreds of volumes of our Reports. To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future. Suffice it to say that especially in this field opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts.

Our starting point is clear. In two recent cases we applied the principle that the Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. In short, the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States. *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761; *Morgan* v. *Virginia,* 328 U. S. 373. In so deciding we reaffirmed, upon fullest consideration, the course of adjudication unbroken through the Nation's history. This limitation on State power, as the *Morgan* case so well illustrates, does not merely forbid a State to single out interstate commerce for hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States. It is immaterial that local commerce is subjected to a similar encumbrance. It may commend itself to a State to encourage a pastoral instead of an industrial society. That is its concern and its privilege. But to compare a State's treatment of its local trade with the exertion of its authority against commerce in the national domain is to compare incomparables.

These principles of limitation on State power apply to all State policy no matter what State interest gives rise to its legislation. A burden on interstate commerce is none the lighter and no less objectionable because it

is imposed by a State under the taxing power rather than under manifestations of police power in the conventional sense. But, in the necessary accommodation between local needs and the overriding requirement of freedom for the national commerce, the incidence of a particular type of State action may throw the balance in support of the local need because interference with the national interest is remote or unsubstantial. A police regulation of local aspects of interstate commerce is a power often essential to a State in safeguarding vital local interests. At least until Congress chooses to enact a nation-wide rule, the power will not be denied to the State. *The Minnesota Rate Cases,* 230 U. S. 352, 402 *et seq.; S. C. Hwy. Dept.* v. *Barnwell Bros.,* 303 U. S. 177; *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 209–12. State taxation falling on interstate commerce, on the other hand, can only be justified as designed to make such commerce bear a fair share of the cost of the local government whose protection it enjoys. But revenue serves as well no matter what its source. To deny to a State a particular source of income because it taxes the very process of interstate commerce does not impose a crippling limitation on a State's ability to carry on its local function. Moreover, the burden on interstate commerce involved in a direct tax upon it is inherently greater, certainly less uncertain in its consequences, than results from the usual police regulations. The power to tax is a dominant power over commerce. Because the greater or more threatening burden of a direct tax on commerce is coupled with the lesser need to a State of a particular source of revenue, attempts at such taxation have always been more carefully scrutinized and more consistently resisted than police power regulations of aspects of such commerce. The task of scrutinizing is a task of drawing lines. This is the historic duty of the

Court so long as Congress does not undertake to make specific arrangements between the National Government and the States in regard to revenues from interstate commerce. See Act of July 3, 1944, 58 Stat. 723; H. Doc. 141, 79th Cong., 1st Sess., "Multiple Taxation of Air Commerce"; and compare 54 Stat. 1059, 4 U. S. C. § 13 *et seq.* (permission to States to extend taxing power to Federal areas). Considerations of proximity and degree are here, as so often in the law, decisive.

It has been suggested that such a tax is valid when a similar tax is placed on local trade, and a specious appearance of fairness is sought to be imparted by the argument that interstate commerce should not be favored at the expense of local trade. So to argue is to disregard the life of the Commerce Clause. Of course a State is not required to give active advantage to interstate trade. But it cannot aim to control that trade even though it desires to control its own. It cannot justify what amounts to a levy upon the very process of commerce across States lines by pointing to a similar hobble on its local trade. It is true that the existence of a tax on its local commerce detracts from the deterrent effect of a tax on interstate commerce to the extent that it removes the temptation to sell the goods locally. But the fact of such a tax, in any event, puts impediments upon the currents of commerce across the State line, while the aim of the Commerce Clause was precisely to prevent States from exacting toll from those engaged in national commerce. The Commerce Clause does not involve an exercise in the logic of empty categories. It operates within the framework of our federal scheme and with due regard to the national experience reflected by the decisions of this Court, even though the terms in which these decisions have been cast may have varied. Language alters, and there is a fashion in judicial writing as in other things.

This case, like *Adams Mfg. Co.* v. *Storen, supra,* involves a tax imposed by the State of the seller on the proceeds of interstate sales. To extract a fair tithe from interstate commerce for the local protection afforded to it, a seller State need not impose the kind of tax which Indiana here levied. As a practical matter, it can make such commerce pay its way, as the phrase runs, apart from taxing the very sale. Thus, it can tax local manufacture even if the products are destined for other States. For some purposes, manufacture and the shipment of its products beyond a State may be looked upon as an integral transaction. But when accommodation must be made between state and national interests, manufacture within a State, though destined for shipment outside, is not a seamless web so as to prevent a State from giving the manufacturing part detached relevance for purposes of local taxation. *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459; *Utah Power & L. Co.* v. *Pfost,* 286 U. S. 165. It can impose license taxes on domestic and foreign corporations who would do business in the State, *Cheney Brothers Co.* v. *Massachusetts,* 246 U. S. 147; *St. Louis S. W. Ry.* v. *Arkansas,* 235 U. S. 350, 364, though it cannot, even under the guise of such excises, "hamper" interstate commerce. *Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1; *Pullman Co.* v. *Kansas,* 216 U. S. 56 (particularly White, J. concurring at p. 63); Henderson, The Position of Foreign Corporations in American Constitutional Law (1918) 118–23, 128–31. It can tax the privilege of residence in the State and measure the privilege by net income, including that derived from interstate commerce. *U. S. Glue Co.* v. *Oak Creek,* 247 U. S. 321; *cf. Atlantic Coast Line* v. *Daughton,* 262 U. S. 413. And where, as in this case, the commodities subsequently sold interstate are securities, they can be reached by a property tax by the State of domicil of the owner. *Virginia* v. *Imperial*

*Sales Co.*, 293 U. S. 15, 19; and see *Citizens National Bank* v. *Durr,* 257 U. S. 99.

These illustrative instances show that a seller State has various means of obtaining legitimate contribution to the costs of its government, without imposing a direct tax on interstate sales. While these permitted taxes may, in an ultimate sense, come out of interstate commerce, they are not, as would be a tax on gross receipts, a direct imposition on that very freedom of commercial flow which for more than a hundred and fifty years has been the ward of the Commerce Clause.

It is suggested, however, that the validity of a gross sales tax should depend on whether another State has also sought to impose its burden on the transactions. If another State has taxed the same interstate transaction, the burdensome consequences to interstate trade are undeniable. But that, for the time being, only one State has taxed is irrelevant to the kind of freedom of trade which the Commerce Clause generated. The immunities implicit in the Commerce Clause and the potential taxing power of a State can hardly be made to depend, in the world of practical affairs, on the shifting incidence of the varying tax laws of the various States at a particular moment. Courts are not possessed of instruments of determination so delicate as to enable them to weigh the various factors in a complicated economic setting which, as to an isolated application of a State tax, might mitigate the obvious burden generally created by a direct tax on commerce. Nor is there any warrant in the constitutional principles heretofore applied by this Court to support the notion that a State may be allowed one single-tax-worth of direct interference with the free flow of commerce. An exaction by a State from interstate commerce falls not because of a proven increase in the cost of the product. What makes the tax invalid is the

fact that there is interference by a State with the freedom of interstate commerce. Such a tax by the seller State alone must be judged burdensome in the context of the circumstances in which the tax takes effect. Trade being a sensitive plant, a direct tax upon it to some extent at least deters trade even if its effect is not precisely calculable. Many States, for instance, impose taxes on the consumption of goods, and such taxes have been sustained regardless of the extra-State origin of the goods, or whether a tax on their sale had been imposed by the seller State. Such potential taxation by consumer States is but one factor pointing to the deterrent effect on commerce by a superimposed gross receipts tax.

It has been urged that the force of the decision in the *Adams* case has been sapped by *McGoldrick* v. *Berwind-White Co.*, 309 U. S. 33. The decision in *McGoldrick* v. *Berwind-White* was found not to impinge upon "the rationale of the *Adams Manufacturing Co.* case," and the tax was sustained because it was "conditioned upon a local activity, delivery of goods within the state upon their purchase for consumption." 309 U. S. at 58. Compare *McLeod* v. *Dilworth Co.*, 322 U. S. 327. Taxes which have the same effect as consumption taxes are properly differentiated from a direct imposition on interstate commerce, such as was before the Court in the *Adams* case and is now before us. The tax on the sale itself cannot be differentiated from a direct unapportioned tax on gross receipts which has been definitely held beyond the State taxing power ever since *Fargo* v. *Michigan*, 121 U. S. 230, and *Philadelphia Steamship Co.* v. *Pennsylvania*, 122 U. S. 326. See also, *e. g., Galveston, H. & S. A. R. Co.* v. *Texas*, 210 U. S. 217; *Kansas City, Ft. S. & M. R. Co.* v. *Kansas*, 240 U. S. 227, 231; *Puget Sound Co.* v. *Tax Commission*, 302 U. S. 90, 94; and compare *Wallace* v. *Hines*, 253 U. S. 66. For not even an "internal regulation" by a

State will be allowed if it directly affects interstate commerce. *Robbins* v. *Shelby Taxing District,* 120 U. S. 489, 494.

Nor is *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459, or *Harvester Co.* v. *Dept. of Treasury,* 322 U. S. 340, any justification for the present tax. The *American Mfg. Co.* case involved an imposition by St. Louis of a license fee upon the conduct of manufacturing within that city. It has long been settled that a State can levy such an occupation tax graduated according to the volume of manufacture. In that case, to lighten the manufacturer's burden, the imposition of the occupation tax was made contingent upon the actual sale of the goods locally manufactured. Sales in St. Louis of goods made elsewhere were not taken into account in measuring the license fee. That tax, then, unlike this, was not in fact a tax on gross receipts. Cf. *Cornell* v. *Coyne,* 192 U. S. 418. And, if words are to correspond to things, the tax now here is not "a tax on the transfer of property" within the State, which was the basis for sustaining the tax in *Harvester Co.* v. *Dept. of Treasury, supra,* at 348.

There remains only the claim that an interstate sale of intangibles differs from an interstate sale of tangibles in respects material to the issue in this case. It was by this distinction that the Supreme Court of Indiana sought to escape the authority of *Adams Mfg. Co.* v. *Storen, supra.* Latin tags like *mobilia sequuntur personam* often do service for legal analysis, but they ought not to confound constitutional issues. What Mr. Justice Holmes said about that phrase is relevant here. "It is a fiction, the historical origin of which is familiar to scholars, and it is this fiction that gives whatever meaning it has to the saying *mobilia sequuntur personam.* But being a fiction it is not allowed to obscure the facts, when the facts become important." *Blackstone* v. *Miller,* 188 U. S. 189, 204.

Of course this is an interstate sale. And constitutionally it is commerce no less and no different because the subject was pieces of paper worth $65,214.20, rather than machines.

*Reversed.*

MR. JUSTICE BLACK dissents.

MR. JUSTICE RUTLEDGE, concurring.

This is a case in which the grounding of the decision is more important than the decision itself. Whether the Court now intends simply to qualify or to repudiate entirely, except in result, *Adams Mfg. Co.* v. *Storen*, 304 U. S. 307, I am unable to determine from its opinion. But that one or the other consequence is intended seems obvious from its refusal to rest the present decision squarely on that case, together with the wholly different foundation on which it now relies. In either event, the matter is important and calls for discussion.

I.

The *Adams* case held the Indiana tax now in issue to be invalid when applied, *without apportionment,* to gross receipts derived from interstate sales of goods made by Indiana manufacturers who sold and shipped them to purchasers in other states. "The vice of the statute" as thus applied, it was held, was "that the tax includes in its measure, *without apportionment,* receipts derived from activities in interstate commerce; and that the exaction is of such a character that if lawful it may in substance be laid *to the fullest extent* by States in which the goods are sold as well as those in which they are manufactured. Interstate commerce would thus be subjected to *the risk of a double tax burden* to which intrastate commerce is

not exposed, and which the commerce clause forbids."
(Emphasis added.)   304 U. S. 307, 311.[1]

Today's opinion refuses to rest squarely on the *Adams*
case, although that case would be completely controlling
if no change in the law were intended.   No basis for dis-
tinguishing the cases on the facts or the ultimate questions
is found or stated.   The Court takes them as identical.[2]
Yet it places no emphasis upon apportionment, the ab-
sence of which the *Adams* opinion held crucial.   The
Court also puts to one side as irrelevant the factor there
most stressed, namely, the danger of multiple taxation,
that is, of similar taxation by other states, if the Indiana
tax should be upheld in the attempted application.

Those matters were the very essence of the *Adams* deci-
sion.   They were in its words "the vice" of the statute as
applied.   The *Adams* opinion gives no reason for believing
that the application of the tax would not have been sus-
tained if either of the two elements vitiating it had been
absent.   On the contrary, the fair, indeed the necessary,
inference from the language and reasons given is that the
tax would not have been voided if there had been no
danger of multiple state taxation or if the tax had been
apportioned so as to eliminate that risk.   Moreover those

---

[1] The Court added: "We have repeatedly held that such a tax is a
regulation of, and a burden upon, interstate commerce prohibited
by Article I, § 8 of the Constitution.   The opinion of the State Supreme
Court stresses the generality and nondiscriminatory character of the
exaction, but it is settled that this will not save the tax if it directly
burdens interstate commerce."   304 U. S. 307, 311–312.   Cf. notes
5 and 16.

[2] The only factual difference is that here the sales were of securi-
ties, there of goods.   It was this upon which Indiana has relied to
distinguish the *Adams* case, asserting originally that it gave domiciliary
foundation for sustaining the tax.   This claim disappeared, in effect,
at the second oral argument, and the Court does not rest on it.   I
agree that, for present purposes, sales of intangibles should be treated
identically with sales of goods.

groundings were strictly in accord with long lines of previous decisions rendered here,[3] were intended to conform to them and to preserve them unimpaired.

Yet now they are put to one side, either as irrelevant or as not controlling and therefore presumably as insufficient,[4] in favor of another rationalization which ignores them completely. Shortly, this is, in reiterated forms, that the tax as applied is laid "directly on" interstate commerce, is a levy "on the very sale" or "the very process" of such commerce, is therefore and solely thereby a "burden" on it, and consequently is an exaction the commerce clause forbids. What outlaws it is neither comparative disadvantage with local trade nor any actual or probable clogging or impeding effect in fact.[5] It is simply the "direct" bearing and "incidence" of the tax on interstate commerce and this alone. Stripped of any discriminatory element and of any actual or probable tendency to block or impede the commerce in fact, this "direct incidence" is itself enough without more to invalidate the tax, although it is one of general application singling out the commerce neither for separate nor for distinct or invidious treatment.

If this ever was the law, it has not been such for many years. In a sense it is a reversion to ideas once preva-

---

[3] See, e. g. Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18; Cudahy Packing Co. v. Minnesota, 246 U. S. 450; U. S. Express Co. v. Minnesota, 223 U. S. 335. And see especially discussion in Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 255–257.

[4] Compare the opinion of MR. JUSTICE FRANKFURTER in Northwest Airlines v. Minnesota, 322 U. S. 292.

[5] As the Court says, "An exaction by a State from interstate commerce falls not because of a proven increase in the cost of the product. What makes the tax invalid is the fact that there is interference by a State with the freedom of interstate commerce." The only "interference" held to be important is the direct incidence of the tax on the commerce, not the double burden or risk of it. Cf. notes 1 and 16.

lent, but long since repudiated,[6] about the "exclusiveness" of Congress' power over interstate commerce which, if now resurrected for general application, will strike down state taxes in a great variety of forms sustained consistently of late. Not since *Cooley* v. *Board of Wardens,* 12 How. 299, has the notion prevailed that the mere existence of power in Congress to regulate commerce excludes the states from exacting revenue from it through exercise of their powers of taxation.[7] Yet if a general tax, applying to all commerce alike, is to be outlawed, regardless of discriminatory consequences or actual or probable impeding effect in fact, simply because it bears "directly" on the commerce and for no other reason, not only will there be a resurrection of Marshall's "exclusive" idea, never prevailing after the *Cooley* case. The effect will be to knock down many types of state taxes held valid since that landmark decision.[8]

That consequence must follow if the presently asserted basis for decision is to be taken as a principle fit for general application and intended to be so used. We cannot assume that the Court intends it to be used otherwise, for that would be to make of it an arbitrary formula applied to dispose of the present case alone and having no validity for any other situation. But the ground relied upon is broad enough to include many other types of situation and of tax, and cannot be restricted logically or in reason to these narrow facts. If discrimination and real risk, in

---

[6] See *e. g.* Ribble, State and National Power Over Commerce (1937) 204; Dowling, Interstate Commerce and State Power (1940) 27 Va. L. Rev. 1, 3–10. See also Frankfurter, The Commerce Clause (1937) 53: "Had Marshall's theory of the 'dormant' commerce power prevailed, the taxable resources of the states would have been greatly confined. The full implications of his theory, if logically pursued, might well have profoundly altered the relations between the states and the central government."

[7] See note 6. See also Wechsler, Stone and the Constitution (1946) 46 Col. L. Rev. 764, 785, quoted in note 10 *infra.*

[8] Cf. text *infra* at notes 14 to 16, also 21, and authorities cited.

the sense of practical effect to clog or impede trade, are irrelevant to the validity of this type of tax, they are equally irrelevant to many others, unless sheer fiction and arbitrary distinction based on inconsequential factors are to be controlling.  If the grounding which disregards them is adequate for disposing of this case, it is adequate also for disposing of many others involving it in which the Court has been at great pains to rest on other factors, unnecessarily it now would seem.

It will be appropriate, before turning to further consideration of the more pertinent decisions, to note the only basis upon which the Court grounds its ruling that "direct" state taxes on "the very process" of interstate commerce are void.  This is because, in the words of the opinion, the commerce clause "by its own force created an area of trade free from interference by the States."  Although this is stated as grounding for the long-established conclusion that even without implementing legislation by Congress the clause is a limitation upon state power, it also is quite obviously the foundation of the further conclusion that "direct" taxes laid by the states within that area are outlawed regardless of any other factor than their direct incidence upon it.

## II.

I agree that the commerce clause "of its own force" places restrictions upon state power to tax, as well as to regulate, interstate commerce.  This has been held through various lines of decision extending back to *Gibbons* v. *Ogden,* 9 Wheat. 1, some of them unbroken.[9]  I also agree that this construction is consonant with the great purpose of the commerce clause to maintain our dis-

---

[9] See *e. g., Robbins* v. *Shelby County Taxing District,* 120 U. S. 489;. *Real Silk Hosiery Mills* v. *Portland,* 268 U. S. 325; *Nippert* v. *Richmond,* 327 U. S. 416, and authorities cited.

tinctively national trade free from state restrictions and barriers against it which the clause was adopted to prevent. But, at any rate since *Cooley* v. *Board of Wardens, supra,* this has not meant that the clause was intended to or could secure "by its own force" that vast area of commercial activity wholly free from "interference," that is, from taxation and regulation, by the states.[10]   Nor for many years has it meant that the field of interstate commerce is to be free from such "interference," simply because it is "direct" or has immediate incidence upon it.[11]   True, language frequently appears in the cases, especially the earlier ones, to the effect that "direct" taxation and regulation by the states are forbidden.   But apart from its inconsistency with both language and results in other cases,[12] in most of those where it has appeared there were other invalidating factors, such as singling out the commerce for special treatment, other types of discrimination, or failure to

[10] See Ribble, *supra,* at 72 ff.; Frankfurter, *supra,* at 24, 56; Wechsler, Stone and the Constitution (1946) 46 Col. L. Rev. 764, 785: "It will summarize his basic conception to say that as the issues were framed in the long debate the position taken by the Court in *Cooley* v. *Board of Wardens* comes closest to according with his thought."

[11] "Experience has taught that the opposing demands that the commerce shall bear its share of local taxation, and that it shall not, on the other hand, be subjected to multiple tax burdens merely because it is interstate commerce, are not capable of reconciliation by resort to the syllogism.   Practical rather than logical distinctions must be sought." *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 259.   See also the dissenting opinion of Mr. Justice Stone in *Di Santo* v. *Pennsylvania,* 273 U. S. 34, 44 (overruled by *California* v. *Thompson,* 313 U. S. 109), "In thus making use of the expressions, 'direct' and 'indirect interference' with commerce, we are doing little more than using labels to describe a result rather than any trustworthy formula by which it is reached."

[12] See, *e. g., McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U. S. 33; *Gwin, White & Prince* v. *Henneford,* 305 U. S. 434; *Nippert* v. *Richmond,* 327 U. S. 416.

apportion where multiple state taxation could result if the tax were sustained.[13]

The fact is that "direct incidence" of a state tax or regulation, apart from the presence of such a factor, has long

[13] Gross receipts taxes which have been sustained fall into the following groups: (a) Those which were fairly apportioned. See, *e. g.*, *Illinois Cent. R.* v. *Minnesota,* 309 U. S. 157; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18; *Wisconsin & Michigan Ry.* v. *Powers,* 191 U. S. 379; *U. S. Express Co.* v. *Minnesota,* 223 U. S. 335; *Ficklen* v. *Taxing District,* 145 U. S. 1. (b) Those which have been justified on a "local incidence" theory. See, *e. g., Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, with which compare *Fisher's Blend Station* v. *Tax Comm'n,* 297 U. S. 650; *McGoldrick* v. *Berwind-White Coal Mining Co.,* 309 U. S. 33; *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459. See also cases cited in note 21. In many cases apportioned gross receipts taxes have been sustained not on the ground that they were apportioned but that they were local in nature. See, *e. g., Maine* v. *Grand Trunk Ry.,* 142 U. S. 217; *New York, L. E. & W. R. Co.* v. *Pennsylvania,* 158 U. S. 431; *Wisconsin & Michigan Ry.* v. *Powers, supra; U. S. Express Co.* v. *Minnesota, supra.*

Gross receipts taxes which have not been sustained fall into the following groups: (a) Those which were not fairly apportioned. See, *e. g., Oklahoma* v. *Wells Fargo Co.,* 223 U. S. 298. (b) Those which were not apportioned and subjected interstate commerce to the risk of multiple taxation. *Philadelphia & So. S. S. Co.* v. *Pennsylvania,* 122 U. S. 326; *Ratterman* v. *Western Union Telegraph Co.,* 127 U. S. 411; *Western Union Telegraph Co.* v. *Alabama,* 132 U. S. 472; *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307; *Gwin, White & Prince* v. *Henneford,* 305 U. S. 434, 439. Cf. *Fargo* v. *Michigan,* 121 U. S. 230, as·explained in *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, 256. (c) Those in which there was a discriminatory element in that they were directed exclusively "at transportation and communication," Lockhart, Gross Receipts Taxes on Transportation (1943) 57 Harv. L. Rev. 40, 65–66. *Galveston, H. & S. A. Ry.* v. *Texas,* 210 U. S. 217, and cf. *New Jersey Tel. Co.* v. *Tax Board,* 280 U. S. 338. But see *Nashville, C. & St. L. Ry.* v. *Browning,* 310 U. S. 362. In both the *Galveston* and *New Jersey Telephone Company* cases, although the taxable events all occurred within the taxing state, the possibility of multiple taxation was nevertheless present. (d) Those in which there

since been discarded as being in itself sufficient to outlaw state legislation. "Local" regulations, under the *Cooley* formula, bear directly on the commerce itself.[14] But they are not outlawed for that reason. Calling them "incidental," where this is done, does not make them "indirect," except in judicial perspective. Police regulations bear no more indirectly or remotely upon the interstate commerce which must observe them than upon the local commerce falling equally within their incidence.

Again, an apportioned tax on interstate commerce is a "direct" tax bearing immediately upon it in incidence. But such a tax is not for that reason invalid. Decisions have sustained such taxes repeatedly, regardless of their direct bearing, provided the apportionment were fairly made and no other vitiating element were present, such as those above mentioned.[15] It was this fact, without question, which the Court had in mind in the *Adams* case, when it carefully saved from its ban any question concerning such a tax as Indiana's if properly apportioned in a situation like the ones presented there and now.[16]

was no discrimination but a possible multiple burden. *Fisher's Blend Station* v. *Tax Comm'n, supra,* as explained in *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. at 260–261. (e) Those in which there was no discrimination, no apportionment and no possibility of multiple burden. *Puget Sound Stevedoring Co.* v. *Tax Commission,* 302 U. S. 90. This decision, it may be noted, might have been rested upon the clause of the Constitution forbidding the states to tax exports. Cf. *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69.

[14] Cf. *California* v. *Thompson,* 313 U. S. 109; *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202; *Robertson* v. *California,* 328 U. S. 440. Indeed, sometimes police regulations bear more heavily on interstate commerce. Cf. *Robertson* v. *California, supra,* and cases cited at note 28 therein.

[15] See cases cited in note 13, *supra.*

[16] The Court said, in answer to the Indiana Supreme Court's emphasis upon the "generality and nondiscriminatory character" of the levy, "but it is settled that this will not save the tax if it directly burdens interstate commerce." 304 U. S. at 312; cf. note 1, *supra.* The same statement is now made in this case not to support the

## III.

The language purporting to outlaw "direct" taxes because they are direct has appeared more frequently perhaps in relation to gross receipts taxes than any other, including both "direct" taxes, apportioned and unapportioned, and others considered "indirect" because purporting to be laid not "on the commerce itself" but upon some "local incident." We have recently held that a tax having effects forbidden by the commerce clause will not be saved merely because it is cast in terms of bearing upon some "local incident."[17] As we then said, all interstate commerce takes place within the states and the consequences forbidden by the commerce clause cannot be achieved legally simply by the device of hooking the tax or other forbidden regulation to some selected "local incident." That such a factor may be chosen for bearing the "direct"

conclusion that these features cannot save a tax where the risk of multiple state taxation would outlaw it, as in the *Adams* case, but to support the vastly broader grounding that the tax is invalid simply because it is "direct" in its incidence. The quoted *Adams* statement had no such significance, as appears not only from its immediate context but also from the further statement, made apropos of *American Mfg. Co.* v. *St. Louis*, 250 U. S. 459, in an effort to distinguish it: "It is because the tax, forbidden as to interstate commerce, reaches *indiscriminately and without apportionment,* the gross compensation for both interstate commerce and intrastate activities that it must fail in its entirety so far as applied to receipts from sales interstate." (Emphasis added.) 304 U. S. at 314. Not "direct" taxation simply, but taxing the entire proceeds without apportionment in the face of threatened or possible multiple state taxation was the "direct burden" found and outlawed in the *Adams* case.

[17] "If the only thing necessary to sustain a state tax bearing upon interstate commerce were to discover some local incident which might be regarded as separate and distinct from 'the transportation or intercourse which is' the commerce itself and then to lay the tax on that incident, all interstate commerce could be subjected to state taxation and without regard to the substantial economic effects of the tax upon the commerce." *Nippert* v. *Richmond,* 327 U. S. 416, 423.

incidence of the tax may be a consideration to be taken into account in determining its validity. But it cannot validate a tax or regulation which produces the forbidden consequences, any more than a "direct tax" which does not produce them can be outlawed because it is direct. Not "directness" or "immediacy" of incidence *per se,* whether "upon the commerce itself" or upon a "local incident," is the outlawing factor, but whether the tax, regardless of the special point of incidence, has the consequences for interstate trade intended to be outlawed by the commerce clause.

The difficulty of any other rule or approach is disclosed most clearly perhaps by contrasting the decision in *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459, with the *Adams* decision and this one, in both of which efforts are made, unsuccessfully in my opinion, to distinguish the *American* case. There the tax was laid upon the manufacture, locally done, of goods sold locally and out of state. But the tax was "measured by" the gross receipts from sales of the goods manufactured, including those sold interstate.[18]

---

[18] To say that this was not in substance a tax on gross receipts, because sales in St. Louis *of goods made elsewhere* were not taken into account in measuring the tax, is simply to ignore the fact that the tax did include all interstate sales of goods manufactured and all returns from them. That the local sales of goods brought in from other states were excepted does not mean either that those sales were interstate transactions (which it was not necessary to decide in view of their exemption) or that the sales out of state included in the measure were not interstate transactions; or that they were not, in substantial effect, taxed upon their gross returns by the measure, notwithstanding the tax was made legally to fall upon the privilege of manufacturing.

The *Adams* decision purported to distinguish *American Mfg. Co.* v. *St. Louis* simply on the ground that the tax was not one laid on the taxpayer's sales or the income derived from them, but was a license fee for engaging in the manufacture which could be measured "by the sales price of the goods produced rather than by their value at the date of manufacture."

A tax upon a local privilege *measured by* the volume of gross receipts from both local and interstate trade [19] would seem to have, in practical effect, the same consequences for blocking or impeding the commerce as one laid "directly" upon it, in any situation where no multiple levy is made, likewise in any where more than one state might find such a local privilege for pegging the tax.[20] And a tax upon gross receipts "in lieu of" property or other taxes [21] cannot be said either to be less "direct" in its incidence upon the commerce than the application of the Indiana tax now in issue or to afford protection against multiple levies the risk of which was held in *Adams Mfg. Co.* v. *Storen* to make the Indiana tax inherently vicious in that application.[22]

Unless we are to return to the formalism of another day, neither the "directness" of the incidence of a tax "upon the commerce itself" nor the fact that its incidence is manipulated to rest upon some "local incident" of the interstate transaction can be used as a criterion or, many times, as a consideration of first importance in determining the validity of a state tax bearing upon or affecting interstate commerce. Not the words "direct" and "indirect" or "local incident" can fulfill the function of judgment in deciding

---

[19] In addition to *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459, see *Oliver Iron Co.* v. *Lord,* 262 U. S. 172; *Hope Natural Gas Co.* v. *Hall,* 274 U. S. 284; *Utah Power & Light Co.* v. *Pfost,* 286 U. S. 165.

[20] Cf. *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 U. S. 217, 227; Morrison, State Taxation of Interstate Commerce (1942) 36 Ill. L. Rev. 727, 738.

[21] See *Postal Telegraph Cable Co.* v. *Adams,* 155 U. S. 688; *U. S. Express Co.* v. *Minnesota,* 223 U. S. 335; *Pullman Co.* v. *Richardson,* 261 U. S. 330. See also discussion in *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 U. S. 217, 226–227.

[22] This is true, though concededly such a tax might work to prevent cumulative or higher tax burdens imposed by a single taxing state. Cf. Lockhart, Gross Receipts Taxes on Interstate Transportation and Communication (1943) 57 Harv. L. Rev. 40.

whether the tax brings the forbidden results. See the dissenting opinion of Mr. Justice Stone in *Di Santo* v. *Pennsylvania,* 273 U. S. 34, 44, quoted in note 11. That can be done only by taking account of the specific effects of state legislation the clause was intended to outlaw, and of the consequences actual or probable of the legislation called in question to create them.

## IV.

Judgments of this character and magnitude cannot be made by labels or formulae. They require much more than pointing to a word. It is for this reason that increasingly with the years emphasis has been placed upon practical consequences and effects, either actual or threatened, of questioned legislation to block or impede interstate commerce or place it at practical disadvantage with the local trade.[23] Formulae and adjectives have been retained at times in intermixture with the effective practical considerations. But proportionately the stress upon them has been greatly reduced, until the present decision; and the trend of recent decisions to sustain state taxes formerly regarded as invalid has been due in large part to this fact.

The commerce clause was not designed or intended to outlaw all state taxes bearing "directly" on interstate commerce. Its design was only to exclude those having the effects to block or impede it which called it and the Constitution itself into being. Not all state taxes, nor indeed all *direct* state taxes, can be said to produce those effects. On the other hand, many "indirect" forms of state taxation, that is, "indirect" as related to "incidence," do in fact produce such consequences and for that reason are invalid.

---

[23] See *Nippert* v. *Richmond,* 327 U. S. 416; *Best & Co.* v. *Maxwell,* 311 U. S. 454. Cf. *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408. See also Wechsler, Stone and the Constitution (1946) 46 Col. L. Rev. 764, 785–787.

It is for this reason that selection of a "local incident" for hanging the tax will not save it, if also the exaction does not in fact avoid the outlawed interferences with the free flow of commerce. Selection of a local incident for pegging the tax has two functions relevant to determination of its validity. One is to make plain that the state has sufficient factual connections with the transaction to comply with due process requirements.[24] The other is to act as a safeguard, to some extent, against repetition of the same or a similar tax by another state.[25] These matters are often interrelated, cf. *Western Union Telegraph Co.* v. *Kansas,* 216 U. S. 1, though in other situations they may be entirely separate. The important difference is between situations where it is essential to show minimal factual connections of the transaction with the taxing state in order to sustain the levy as against due process objections for "want of jurisdiction to tax"; [26] and other situations where, although such connections clearly are present, the necessity is for showing that the tax, if sustained, will create a multiple tax load or other consequences having the forbidden effects.

This case is not one of the former sort. The transactions were as closely connected in fact with Indiana as with any other state.[27] But the case is one of the latter

---

[24] See dissenting opinion in *McLeod* v. *Dilworth Co.,* 322 U. S. 327, at 356–357. See also *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 444–445.

[25] See McNamara, Jurisdictional and Interstate Commerce Problems in the Imposition of Excises on Sales (1941) 8 Law & Contemp. Prob. 482, 491. Compare the discussion of a proposed federal statute to give the buyer's state the right to impose nondiscriminatory sales taxes. Proc. 27th Ann. Conf. Nat. Tax Assn. (1934) 136–160. See also Perkins, The Sales Tax and Transactions in Interstate Commerce (1934) 12 N. C. L. Rev. 99.

[26] Cf. note 25.

[27] Indiana was the state by whose law the trust was created. It was the *situs* of the trust's administration. It was the place where the

type, that is, where, despite those connections, there were equally close and important ones in another state, New York; and therefore, as the *Adams* case declared, the risk of multiple state taxation would be incurred, unless one or the other or both states were forbidden to tax the transaction as such, or were required to apportion the tax. Not the "directness" of the tax in its bearing upon the commerce, but this danger is the crucial issue in this case, as it was in the *Adams* case. In other words, but for the possibility that more states than one would levy the same or a similar tax, such an application as was made of Indiana's tax in the *Adams* case and here would be no more burdensome or objectionable than other applications of the same tax this Court has sustained or of other taxes likewise held valid.[28]

## V.

This Court in recent years has gone far in sustaining state taxes laid upon local incidents of interstate transactions by both the state of origin and the state of the mar-

---

securities were kept prior to mailing for delivery in accordance with the terms of their sale. Cf. *Curry* v. *McCanless,* 307 U. S. 357. The directions for sale were given there. The proceeds were forwarded to Indiana and there received into the corpus of the trust. The state's connections with the trust, and with the property which was the subject of the sale, more than satisfy any due process requirement for exercise of the power to tax either the property or transactions relating to its disposition taking place as largely within Indiana's borders as did the sales in this case.

[28] The cases, aside from *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307, which involve the Indiana gross receipts tax are: *Department of Treasury* v. *Wood Preserving Corp.,* 313 U. S. 62; *Department of Treasury* v. *Ingram-Richardson Mfg. Co.,* 313 U. S. 252; *International Harvester Co.* v. *Dept. of Treasury,* 322 U. S. 340; *Ford Motor Co.* v. *Dept. of Treasury,* 323 U. S. 459. See also *General Trading Co.* v. *State Tax Commission,* 322 U. S. 335; cf. *Northwest Airlines* v. *Minnesota,* 322 U. S. 292.

ket.[29]   Perhaps it may be said, in view of such decisions, that it has more clearly sustained such taxes at the marketing end than by the state of origin,[30] although this may be matter for debate.   In any event, the factual connections of the taxing state with the interstate transaction in the cases where the tax has been sustained hardly can be regarded as greater or more important than those of Indiana with the transactions involved in the *Adams* case and here. Nor could it be shown in fact that in some of them, at any rate, the danger of multiple state taxation was appreciably less, if it be assumed that the forwarding state has the same power to tax the transaction, by pegging the tax upon a local incident, as has been recognized for the state of market.

Such taxes, whether in one state or the other, may in fact block or impede interstate commerce as much as, or more than, one placed directly upon the commerce itself. They have been sustained, nevertheless, not simply because of their bearing upon a local incident, but because in the circumstances of their application they were considered to have neither discriminatory effects upon interstate trade as compared with local commerce nor to impose upon it the blocking or impeding effects which the commerce clause was taken to forbid.[31]

---

[29] See, *e. g., McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33; *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359; *General Trading Co.* v. *Tax Commission,* 322 U. S. 335; *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250; *Coverdale* v. *Arkansas-Louisiana Pipe Line Co.,* 303 U. S. 604; *Department of Treasury* v. *Ingram-Richardson Mfg. Co.,* 313 U. S. 252.

[30] Compare *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, with *McLeod* v. *Dilworth Co.,* 322 U. S. 327.   See Powell, New Light on Gross Receipts Taxes (1940) 53 Harv. L. Rev. 909.

[31] See *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, 58, quoted *infra* Part VI.

This in my judgment is the appropriate criterion to be applied, rather than any mere question of "direct" or "indirect" incidence upon a "local incident." The absence of any such connection with the taxing state is highly material.[32]   Its presence cannot be the controlling consideration for validating the tax.   *Nippert* v. *Richmond*, 327 U. S. 416.   In this view it would seem clear that the validity of such a tax as Indiana's, applied to situations like those presented in the *Adams* case and now, should be determined by reference not merely to the "direct incidence" of the tax, but by whether those forbidden consequences would be produced, either through the actual incidence of multiple taxes laid by different states or by the threat of them, with resulting uncertainties producing the same impeding consequences.[33]

Thus, it is highly doubtful that the levy in this case, or in the *Adams* case, actually had any impeding effect whatever upon the transactions or the free flow interstate of such commerce.[34]   But the *Adams* case found the impediment in the assumption that if one state could tax, so also could the other, and in that event, a double burden would result for interstate commerce not borne by local

[32] As a matter of minimal due process requirements.   Cf. text *infra* at notes 24 to 27.

[33] The danger of an impending burden or barrier from multiple state taxation could be real and substantial in a particular case if the threat of such taxation were actual or probable or if its threatened incidence were involved in such actual uncertainty that this uncertainty itself would constitute, in practical effect, a substantial clog.

[34] The Indiana tax was only one per cent of the proceeds of the sales. The record indicates, too, that the New York Stock Transfer tax was collected from the proceeds of the sale in New York.   The amount of the tax was three cents per share sold for less than twenty dollars, and four cents per share sold for more than twenty dollars.   Tax Law §§ 270, 270a;   *O'Kane* v. *New York*, 283 N. Y. 439, 28 N. E. 2d 905. The tax did not apply to the transfer of bonds.   Cf. Op. Atty. Gen. N. Y. 1939, p. 208.

trade. This danger, it was said, was inherent in the type of the tax, since it was not apportioned, and in consequence the tax as applied must fall.

The basic assumption was not true as a universally or even a generally resulting consequence, for two reasons. One is that it would not follow necessarily as a matter of fact that both states would tax or, if they did so, that the combined effects of the taxes would be either to clog or to impede the commerce.[35] The other, it no more follows, as a matter of law, that because one state may tax the other may do likewise.

The *Adams* decision did not take account of any difference, as regards the risk of multiple state taxation, between situations where the multiple burden would actually or probably be incurred in fact and others in which no such risk would be involved. It rather disregarded such differences, so that "the risk of a double tax burden" on which the Court relied to invalidate the levy was not one actually, probably, or even doubtfully imposed in fact by another state.[36] It rather was one which resulted only from an assumed, and an unexercised, power in that state to impose a similar tax.

The Court was not concerned with whether the forbidden consequences had been incurred in the particular situation or might not be incurred in others covered by its ruling. The motivating fear was more general. The

[35] Cf. note 31. Whether such a tax would in fact produce the forbidden results or not would depend upon the incidence or likelihood of the incidence of a like tax in the other, or another, jurisdiction having similar power. Frequently this likelihood will be, in fact, either nil or small.

[36] The opinion discloses no consideration of any question or suggestion whether a like or other tax had been or was likely to be imposed by the state of destination, or even that such a tax by that state was doubtfully incident. Such an inquiry would have been inconsistent with the Court's thesis.

ultimate risk which the Court sought to avoid was the danger that gross income or gross receipts tax legislation, without apportionment, might be widely adopted if the door were once opened and, if adopted and applied to interstate sales by all or many of the states, would result generally in bringing such sales within the incidence of multiple state taxation of that nature. Rather than incur this risk, with the anticipated consequent widespread creation of multiple levies, the Court in effect forestalled them at the source. Its action was prophylactic and the prophylaxis was made absolute.

By thus relieving interstate commerce from liability to pay taxes in either state, without any showing that both had laid them, the effect was, not simply to relieve that commerce from multiple burden, but to give it exemption from taxes all other trade must bear.[37] Local trade was thus placed at disadvantage with interstate trade, by the amount of the tax, and the commerce clause thereby became a refuge for tax exemption, not simply a means of protection against unequal or undue taxation. Certainly its object was not to create for interstate trade such a specially privileged position.

But the alternatives to such a ruling were not themselves free from difficulty. They may be stated shortly. But preliminarily I accept the view, frequently declared,[38] that a state runs afoul the commerce clause when it singles out interstate commerce for special taxation not applied to other trade or otherwise discriminates against it or treats it invidiously. Moreover, all other things being equal,

---

[37] It is assumed, of course, that a nondiscriminatory tax of general applicability laid by the taxing state would be involved.

[38] See *Best & Co.* v. *Maxwell,* 311 U. S. 454; *Hale* v. *Bimco Trading Co.,* 306 U. S. 375; *Guy* v. *Baltimore,* 100 U. S. 434; *Webber* v. *Virginia,* 103 U. S. 344; *Welton* v. *Missouri,* 91 U. S. 275; *Voight* v. *Wright,* 141 U. S. 62; *Brimmer* v. *Rebman,* 138 U. S. 78.

multiple state taxation of gross receipts, although by non-discriminatory taxes of general applicability, does compel the latter to bear a heavier tax burden than local trade in either state. The cumulative tax burden is in effect discriminatory, involving in any practical view the exact effects of a single discriminatory tax. Although the difference in total tax load may not be sufficient actually to block or impede the free flow of interstate trade,[39] discrimination alone, without regard to showing of further consequences, has been held consistently to be sufficient for outlawing the tax.

This too I accept. For discrimination not only is ordinarily itself invidious treatment, but has an obvious tendency toward blocking or impeding the commerce, if not always the actual effect of doing so. Nor is the discriminatory tendency or effect lessened because it results from cumulation of tax burdens rather than from a single tax producing the same consequence. To allow both states to tax "to the fullest extent" would produce the invidious sort of barrier or impediment the commerce clause was designed to stop. But the bare unexercised power of another state to tax does not produce such results. It only opens the way for them to be produced. This danger is not fanciful but real, more especially in a time when new sources of revenue constantly are being sought. Accordingly, I agree that this door should not be opened.

But it is not necessary to go as far as the *Adams* case went, or as the decision now rendered goes, in order to prevent the anticipated deluge. There is no need to give interstate commerce a haven of refuge from taxation, albeit of gross receipts or from "direct" incidence, in order

---

[39] For a variety of reasons, among which might be the larger capacity of such trade to absorb the difference, by reason of greater volume, without sustaining loss of profit, in the particular sort of commerce or type of transaction. See also note 34.

to safeguard it from evils against which the commerce clause is designedly protective. Less broad and absolute alternatives are available and are adequate for the purpose of protection without creating the evils of total exemption.

The alternative methods available for avoiding the multiple state tax burden may now be stated. They are: (1) To apply the *Adams* ruling, stopping such taxes at the source, unless the tax is apportioned, thus eliminating the cumulative burdens; [40] (2) To rule that either the state of origin or the state of market, but not both, can levy the exaction; (3) To determine factually in each case whether application of the tax can be made by one state without incurring actual danger of its being made in another or the risk of real uncertainty whether in fact it will be so made.

The *Adams* solution is not unobjectionable, for reasons already set forth. To deprive either state, whether of origin or of market, of the power to lay the tax, permitting the other to do so, has the vice of allowing one state to tax but denying this power to the other when neither may be as much affected by the deprivation as would be the one allowed to tax and, in any event, both may have equal or substantial due process connections with the transaction. The solution by factual determination in particular cases of the actual or probable incidence of both taxes is open to two objections. One is that to some extent it would make the taxing power of one or both states depend upon whether the other had exercised, or probably would

---

[40] The *Adams* decision, of course, made no direct ruling upon an actual tax laid by the state of destination. But the basic premise of its rationalization would be altogether without substance if it were taken to mean that such a tax could be levied there without meeting the same barrier, and for the same reason, as the tax levied by Indiana, the state of origin, encountered.

exercise, the same power. The other would lie in the volume of litigation such a rule would incite and the difficulties, in some cases at least, of making the factual determination.

## VI.

The problem of multiple state taxation, absent other factors making for prohibition, is therefore one of choosing among evils. There is no ideal solution. To leave the matter to Congress, allowing both states to tax "to the fullest extent" until it intervenes, would run counter not only to the long-established rules requiring apportionment where incidence of multiple taxes would be likely, but also in substance and effect to those forbidding discrimination, without the consent of Congress, cf. *Prudential Ins. Co.* v. *Benjamin,* 328 U. S. 408, as well as the long-settled rule that the clause is "of its own force" a prohibition upon the states. To require factual determination of forbidden effects in each case would be to invite costly litigation, make decision turn in some cases, perhaps many, on doubtful facts or conclusions, and encourage the enactment of legislation involving those consequences. The *Adams* ruling, as I have said, creates for many situations a tax refuge for interstate commerce and does this in both states.

As among the various possibilities, I think the solution most nearly in accord with the commerce clause, at once most consistent with its purpose and least objectionable for producing either evils it had no design to bring or practical difficulties in administration, would be to vest the power to tax in the state of the market, subject to power in the forwarding state also to tax by allowing credit to the full amount of any tax paid or due at the destination. This too is more nearly consonant with what the more recent decisions have allowed, if full account is taken of their effects.

In *McLeod* v. *Dilworth Co.,* 322 U. S. 327, 361, I have set forth the reasons leading to this conclusion.[41] It may be added that such a result would avoid altogether the undesirable features of factual determination in each case; would prevent the multiple and, in effect, discriminatory burden which would follow from allowing both states to tax until Congress should intervene; and would reduce by half, at least, the tax refuge created by the *Adams* ruling, without incurring other outlawed effects.

It is true this view logically would deny the state of origin power to tax, notwithstanding its adequate due process connections, except by giving credit for taxes due at the destination.[42] But the forwarding state has no greater power under the *Adams* ruling and none at all under the present one if it is to be applied consistently and, as I think, this can be taken to outlaw both unapportioned and apportioned taxes.

I have no doubt that under the law prevailing until now this tax would have been sustained, if apportioned, under the *Adams* decision and others.[43] Nor have I any question that such a tax laid by New York would be upheld under

---

[41] "If in this case it were necessary to choose between the state of origin and that of market for the exercise of exclusive power to tax, or for requiring allowance of credit in order to avoid the cumulative burden, in my opinion the choice should lie in favor of the state of market rather than the state of origin. The former is the state where the goods must come in competition with those sold locally. It is the one where the burden of the tax necessarily will fall equally on both classes of trade. To choose the tax of the state of origin presents at least some possibilities that the burden it imposes on its local trade, with which the interstate traffic does not compete, at any rate directly, will be heavier than that placed by the consuming state on its local business of the same character."

[42] Credit allowed for taxes paid elsewhere, see *Henneford* v. *Silas Mason Co.,* 300 U. S. 577; *General Trading Co.* v. *Tax Commission,* 322 U. S. 335, is a form of apportionment, though not the only one.

[43] See also *Gwin, White & Prince* v. *Henneford,* 305 U. S. 434.

those decisions. Indeed, in my opinion, the necessary effect of *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, as appellee asserts, is to sustain power in the state of the market to tax "to the fullest extent" without apportionment by nondiscriminatory taxes of general applicability, transactions essentially no different from the ones involved in this case and in the *Adams* case.

It is true the *Berwind-White* case purported to distinguish the *Adams* case. But it did so by pointing out that the *New York* tax was "conditioned upon a local activity, delivery of goods within the state upon their purchase for consumption" and that "the effect of the tax, even though measured by the sales price, as has been shown, neither discriminates against nor obstructs interstate commerce more than numerous other state taxes which have repeatedly been sustained as involving no prohibited regulation of interstate commerce." 309 U. S. 33, 58.

This comes down to sustaining the tax, as was done in *American Mfg. Co.* v. *St. Louis, supra,* relied upon to distinguish the *Adams* case, simply because the tax was pegged upon the "local incident" of delivery. Apart from the reasons I have set forth above for regarding this as not being controlling, that basis was flatly repudiated in *Nippert* v. *Richmond,* 327 U. S. 416, as adequate for sustaining a tax having otherwise the forbidden effects and features. So here, in my opinion, it is hardly adequate to distinguish the *Adams* case, leaving it unimpaired, or to differentiate consistently the broader ruling made in this case.

I therefore agree with the appellee that the effect of the *Berwind-White* ruling was in substance, though not in words, to qualify the *Adams* decision, and that the combined effect of the two cases, taken together, was to permit the state of the market to tax the interstate transaction,

but to deny this power to the forwarding state, unless by credit or otherwise it should make provision for apportionment. See Powell, New Light on Gross Receipts Taxes (1940) 53 Harv. L. Rev. 909, 939. Whether or not such a provision would save the Indiana tax as now applied, in view of what I think was the effect of *Berwind-White* on any basis other than sheer formalism, need not now be considered.[44]

Whether or not acknowledgment of this effect of the *Berwind-White* decision would require reconsideration of the validity of apportioned taxes otherwise than by full credit, laid by the forwarding state,[45] neither that fact nor the effect of *Berwind-White* in qualifying the *Adams* ruling justifies the broader ruling now made to reach the same result as the *Adams* case reached. The trend of recent decisions has been toward sustaining state taxes formerly regarded as outlawed by the commerce clause. The present decision, by its reversion to the formal and discarded grounding in the "direct incidence" of the tax, is a reversal of that trend. It is one, moreover, unnecessary for sustaining the result the Court has reached. Its consequence, if followed in logical application to apportioned taxes, will be to outlaw them, for they bear as "directly" on "the commerce itself" as does the tax now stricken down in its

---

[44] It is obvious that an apportioned tax laid by the forwarding state, taken in conjunction with an unapportioned one levied by the state of the market, would produce the effect of multiple state levies to the extent of the apportioned tax unless the apportionment were made by giving full credit for the other tax. In the latter event, of course, there would be no effect of multiple burden in the sense forbidden by the rule requiring apportionment and sustaining properly apportioned taxes. In the absence of a credit to the full amount of the marketing state's tax, the apportioned tax of the forwarding state, although making a cumulative burden, would impose only a reduced one as compared with an unapportioned tax by that state.

[45] Cf. note 44.

present application. So also does the type of tax sustained in the *Berwind-White* case, in everything but verbalism.

I think the result now reached is justified, as necessary to prevent the cumulative and therefore discriminatory tax burden which would rest on or seriously threaten interstate commerce if more than one state is allowed to impose the tax, as does Indiana, upon the gross receipts from the sale without apportionment or credit for taxes validly imposed elsewhere. This result would follow in view of the *Berwind-White* decision and others like it,[46] if not only the state of the market but also the forwarding state could tax the sale "to the fullest extent" upon the gross receipts. For this reason I concur in the result.

But in doing so I dissent from grounding the decision upon a foundation which not only will outlaw properly apportioned taxes, thus going beyond the *Adams* decision, unless the Court is merely to reiterate the rule forbidding "direct" taxation of interstate sales only to recall it when a case involving a properly apportioned tax shall arise; but also will require outlawing many other types of tax heretofore sustained, unless a similar retreat is made.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE MURPHY concurs, dissenting.

I think the Court confuses a gross receipts tax on the Indiana broker with a gross receipts tax on his Indiana customer. *Gwin, White & Prince, Inc.* v. *Henneford,* 305 U. S. 434, would hold invalid a gross receipts tax, unappor-

---

[46] See the "use tax" cases: *General Trading Co.* v. *Tax Commission,* 322 U. S. 335; *Felt & Tarrant Mfg. Co.* v. *Gallagher,* 306 U. S. 62; *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359; *Nelson* v. *Montgomery Ward & Co.,* 312 U. S. 373. See also *Jagels* v. *Taylor,* 309 U. S. 619, discussed in *McNamara, supra,* note 25, at 487.

tioned, on the broker. In that case the taxpayer was a marketing agent for fruit growers in the State of Washington. The agent made sales and deliveries of the fruit in other States and in foreign countries, collected the sales prices, and remitted the proceeds, less charges, to the customers. The Court held that the gross receipts tax, being unapportioned, was invalid. There are two reasons why that result followed. In the first place, as the Court stated at p. 437, "the entire service for which the compensation is paid is in aid of the shipment and sale of merchandise" in interstate or foreign commerce. "Such services are within the protection of the commerce clause." In the second place, as the Court stated at p. 439, "If Washington is free to exact such a tax, other states to which the commerce extends may, with equal right, lay a tax similarly measured for the privilege of conducting within their respective territorial limits the activities there which contribute to the service. The present tax, though nominally local, thus in its practical operation discriminates against interstate commerce, since it imposes upon it, merely because interstate commerce is being done, the risk of a multiple burden to which local commerce is not exposed."

Under that view a tax on the commissions of the Indiana broker would be invalid. But I see no more reason for giving the customer immunity than I would for giving immunity to the fruit growers who sold their fruit through the broker in *Gwin, White & Prince, Inc.* v. *Henneford, supra.*

Concededly almost any local activity could, if integrated with earlier or subsequent transactions, be treated as parts of an interstate whole. In that view *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459, would find survival difficult. For in that case a state tax on a manufacturer was upheld though the tax was measured by the value of the goods

manufactured within the State and thereafter sold in interstate commerce. In *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250, a tax laid on the gross receipts of a trade journal published in New Mexico was sustained although out-of-state advertisements were included in the journal and there was interstate distribution of it. The Court treated the local business as separate and distinct from the transportation and intercourse which are interstate commerce and which were employed to conduct the business.

I think the least that can be said is that the local transactions or activities of this taxpayer can be as easily untangled from the interstate activities of his broker.

Any receipt of income in Indiana from out-of-state sources involves, of course, the use of interstate agencies of communication. That alone, however, is no barrier to its taxation by Indiana. *Western Live Stock* v. *Bureau of Revenue, supra.* Cf. *New York ex rel. Cohn* v. *Graves,* 300 U. S. 308. The receipt of income in Indiana, like the delivery of property there, *International Harvester Co.* v. *Dept. of Treasury,* 322 U. S. 340, is a local transaction which constitutionally can be made a taxable event. For a local activity which is separate and distinct from interstate commerce may be taxed though interstate activity is induced or occasioned by it. *Western Live Stock* v. *Bureau of Revenue, supra,* p. 253. The management of an investment portfolio with income from out-of-state sources is as much a local activity as the manufacture of goods destined for interstate commerce, *American Mfg. Co.* v. *St. Louis, supra,* the publication of a trade journal with interstate revenues, *Western Live Stock* v. *Bureau of Revenue, supra,* or the growing of fruit for interstate markets, *Gwin, White & Prince, Inc.* v. *Henneford, supra.* All such taxes affect in some measure interstate commerce or increase the cost of doing it. But, as we pointed out in *McGoldrick* v. *Ber-*

*wind-White Coal Mining Co.,* 309 U. S. 33, 48, that is no constitutional obstacle.

*Adams Mfg. Co.* v. *Storen,* 304 U. S. 307, is different. In that case the taxpayer had its factory and place of business in Indiana and sold its products in other States on orders taken subject to approval at the home office. The Court thought the risk of multiple taxation was real, because of the interstate reach of the taxpayer's business activities. The fact is that the incidence of that tax was comparable to the incidence of an unapportioned tax on interstate freight revenues.

The present tax is not aimed at interstate commerce and does not discriminate against it. It is not imposed as a levy for the privilege of doing it. It is not a tax on interstate transportation or communication. It is not an exaction on property in its interstate journey. It is not a tax on interstate selling. The tax is on the proceeds of the sales less the brokerage commissions and therefore does not reach the revenues from the only interstate activities involved in these transactions. It is therefore essentially no different, so far as the Commerce Clause is concerned, from a tax by Indiana on the proceeds of the sale of a farm or other property in New York where the mails are used to authorize it, to transmit the deed, and to receive the proceeds.

I would adhere to the philosophy of our recent cases [1] and affirm the judgment below.

---

[1] Of which *Gwin, White & Prince, Inc.* v. *Henneford, supra, Western Live Stock* v. *Bureau of Revenue, supra,* and *McGoldrick* v. *Berwind-White Coal Mining Co., supra,* are illustrative.