LASSER, P.J.T.C.
In this consolidated action New York Fuel Terminal Corporation (NYFT), RAD Oil Corporation (RAD) and Century Resources Corporation (Century) contest the cancellation of their New Jersey motor fuels distributors’ licenses by the Division of Taxation for failure to comply with N.J.A.C. 18:18-1.1, a regulation promulgated by the Director requiring that the holder of a distributor’s license “must import 50 per cent or more of the *28 total amount of motor fuels handled by him in this state calculated on a calendar year basis” (the “50% rule”).
Plaintiffs contend that, without a valid New Jersey distributor’s license, they will not be able to purchase motor fuel in New Jersey for export on a tax-free basis but instead will be required to pay the motor fuel tax on purchase in New Jersey and apply for a refund. Plaintiffs contend that, as a result, they will be at a significant disadvantage since their competitors may purchase for export on a tax-free basis. Plaintiffs therefore allege that cancellation of their distributors’ licenses is violative of the Due Process, Equal Protection and Commerce Clauses of the United States Constitution.
After the institution of this action, the Director stayed the cancellation of plaintiffs’ distributors’ licenses and agreed to keep them in force during the pendency of this action.
I.
The parties have agreed on a partial stipulation of facts, which was supplemented at trial by testimony. The following recital of facts is from the stipulated facts, witness testimony, the documentary evidence and findings made therefrom.
The New Jersey Motor Fuels Tax Act, N.J.S.A. 54:39-1 et seq., imposes an excise tax of $.08 a gallon on every gallon of motor fuel sold or used in New Jersey.[1] N.J.S.A. 54:39-27. To assure that the motor fuel tax is paid, the Miscellaneous Tax Bureau of the Division of Taxation closely regulates the distribution chain from the manufacturer or importer to the ultimate user through licensing, record keeping, inventory and bonding requirements. The statute creates the following categories of motor fuel licensees:
1. Distributor (importer into New Jersey or a refiner). N.J.S.A. 54:39-3.
*29 2. Gasoline jobber (specialized wholesale dealer). N.J.S.A. 54:39-6.1.
3. Special license “A” (dealer who imports incidental to his dealership business). N.J.S.A. 54:39-64(a).
4. Wholesale dealer (person who sells motor fuels to other persons who resell for consumption). N.J.S.A. 54:39-6.
5. Retail dealer (person engaged in retail sale of motor fuels). N.J.S.A. 54:39-5.
To be entitled to a distributor’s license, a person must either: (1) be an importer of motor fuel into the state for use, distribution, storage or sale in this state (“importer-distributor”), or (2) be a person who produces, refines, manufactures, blends or compounds fuels and who sells, uses, stores or distributes that fuel within the State (“refiner-distributor”). N.J.S.A. 54:39-3. For licensing purposes an importer is defined by N.J.A.C. 18:18-1.1, adopted in 1969, as one who meets the 50% rule.[2]
The regulations do not define the terms “refiner,” “blender,” “compounder,” “manufacturer” or “producer.” The Director has not required a person holding a distributor’s license as a refiner-distributor to actually engage in refining in New Jersey, have production facilities in New Jersey or import a minimum amount of motor fuel into the state in order to qualify for a New Jersey distributor’s license. The Division does not verify whether the motor fuel sold in New Jersey by a distributor licensed by virtue of being a refiner has actually been refined by that licensed distributor.
The gasoline jobber is a specialized wholesale dealer defined in N.J.S.A. 54:39-6.1 and N.J.A.C. 18:18-1.1 as a motor fuels *30 wholesale dealer who regularly makes 95% or more of his gasoline sales in New Jersey to not less than 25 retail dealers, fleet operators or other large consumers, and who maintains fixed gasoline storage facilities in New Jersey with a capacity of 50,000 gallons or more.
Other than distributors and jobbers, the only class of persons permitted to import motor fuel into New Jersey pursuant to N.J.S.A. 54:39-64(a) is the holder of a special license “A.” This license is issued to a person importing fuel into the State “for the purpose of selling same incidental to his principal business of buying and selling fuels in this State or for the purpose of consuming the same.” Holders of a special license “A” may not purchase motor fuel on a tax-free basis.
There are four tiers in the New Jersey statutory scheme for imposition of the motor fuel tax. The first tier is the importation, manufacture or buying, selling and trading of motor fuel prior to its entry into the distribution chain. The importer, refiner and gasoline jobber are all at the first tier. At the second tier is the first sale in the distribution chain, to the wholesale dealer. At the third tier is the sale from the wholesale dealer to the retailer, and at the fourth tier is the sale from the retail dealer to the consumer. This statutory scheme contemplates that motor fuel tax will first become due when a distributor or a gasoline jobber either sells to an entity in the second tier or below, or consumes the fuel itself. When a tax is paid at the second tier, that tax is reimbursed at the third tier, and in turn reimbursed at the fourth tier by the consumer. No tax is required to be paid at the first-tier level. Therefore, transactions between licensed distributors or jobbers are on a tax-free basis.[3]
*31 It has been stipulated that the statutory and regulatory provisions allowing for tax-free sales between licensed distributors and gasoline jobbers have as their principal purposes: (1) aiding such distributors in meeting cash flow requirements, and (2) promoting the better utilization of facilities for the handling of motor fuel within New Jersey. The first purpose is accomplished simply because sales between licensed distributors and gasoline jobbers are not taxable. The second purpose is accomplished because tax-free sales facilitate the use by licensed distributors and jobbers of the marketing facilities of other companies in New Jersey. Allowing tax-free sales makes more distributors available in more areas of the State at a lower cost to New Jersey consumers. A third purpose is to aid taxpayers in meeting the monthly reporting provision included in the 1950 legislation.[4]
Excise tax legislation can provide for tax collection at any level of manufacture, distribution or sale. In 1984 the State of New York, experiencing what it regarded as substantial motor fuel tax evasion, moved its collection system from the wholesale distributor level up to the refiner and importer level, and the New York tax on motor fuel is now imposed on the first import.[5]
Tax collection is more efficient and tax evasion more difficult when tax is first imposed at the time of transfer from a smaller number of licensed distributors and gasoline jobbers, rather than at the time of transfer from a substantially larger number of wholesale or retail dealers. New Jersey imposes liability for the tax on the first sale in the distribution chain (second tier) because, at this tier, there are fewer participants and transactions than at lower tiers. In 1984 there were thousands of *32 retail dealers but only 155 licensed distributors and 27 licensed gasoline jobbers.
Of these 155 distributors licensed by New Jersey in 1984,[6] 23 were licensed as refiner-distributors and 132 as importer-distributors. Twenty-three of the 155 licensed distributors imported over 50% of their own total New Jersey handle. Seven of these 23 distributors who met the 50% rule requirement held licenses as refiner-distributors. Only 16 of the 132 licensed importer-distributors met the requirement of the 50% rule. Enforcement of the 50% rule would mean that 116 importer-distributors would lose their distributor’s licenses.
The motor fuel business is concentrated among a small number of licensed distributors. Of the 8.922 billion gallons of motor fuel imported into New Jersey in 1984, 79% or 7.05 billion gallons were imported by the 23 distributors holding licenses as refiners. This figure increases to 83% or 7.438 billion gallons when the motor fuel imported by the 16 importer-distributors who meet the requirements of the 50% rule is added.
In 1984 approximately 65 licensed distributors exported 7.112 billion gallons of gasoline from New Jersey. Of these 65 licensed distributors, 20 refiner-distributors exported approximately 5.87 billion gallons, or 82.5%. Included in these 20 refiner-distributors were seven who imported over 50% of their total New Jersey handle.
At the present time substantially all of the motor fuel storage terminal capacity for the New York harbor area is located in New Jersey. Because New Jersey is a pipeline terminus and a major terminal base for the New York Harbor market, most motor fuel for distribution to New York and Connecticut is first brought to New Jersey. In 1984, of the total of 11 billion gallons of motor fuel either imported into or refined in New Jersey, 3.6 billion gallons were consumed in New Jersey. The balance, about two-thirds, was exported. Because the major terminal facilities for the New York Harbor market are located *33 in New Jersey, New Jersey’s system of taxing motor fuel substantially influences the motor fuel business in the New York Harbor market. Free flow of motor fuel through this State is important in order to keep the market competitive.
II.
Plaintiffs are smaller independent fuel oil companies dealing in gasoline, # 2 fuel oil and related petroleum products. Their principal business is the distribution of these products in New York and Connecticut. Trading in motor fuel stored in New Jersey and importing of motor fuel into New Jersey for a limited number of customers are only incidental parts of their business. They are participants in the New York Harbor motor fuel market and the New York Mercantile Exchange.
NYFT, a New York corporation and a registered distributor of motor fuel in New York, is engaged in importing, exporting, terminaling, storing and reselling motor fuel in New Jersey, New York and Pennsylvania and trading motor fuel futures on the exchange. NYFT purchases motor fuel from wholesalers located in New Jersey and resells it directly or through other companies to service stations in New York State. NYFT purchases motor fuel either by barge load through Buckeye Pipeline System from a terminal in Linden or from storage in a terminal owned and operated by Citgo Petroleum Corporation[7] in Linden, or from B.P. Oil in Linden. NYFT then either resells this motor fuel in New Jersey or exports it to New York State. NYFT owns and operates one of the few motor fuel terminals in New York City not owned and operated by a major oil company. This terminal is located in Brooklyn, New York. NYFT is the largest reseller of Citgo gasoline in New York State. NYFT’s gross sales were $29,630,000 in 1984, $351,850,-000 in 1985 and $110,224,000 in 1986. NYFT is not a refiner of motor fuel.
*34 On or about February 10, 1983 NYFT was issued a New Jersey distributor’s license by virtue of NYFT’s intention to import motor fuel into New Jersey. On September 17,1984 the Director, asserting that NYFT failed to import 50% of the motor fuel it sold, as required by N.J.A.C. 18:18-1.1, cancelled NYFT’s distributor’s license effective September 30, 1984. Cancellation of plaintiffs’ licenses has been stayed pending the outcome of this litigation.
At no time during the period it was licensed as a New Jersey distributor did NYFT’s monthly imports exceed .7% (.007) of the total amount of gasoline it handled in New Jersey monthly. Since NYFT does not resell in New Jersey 95% or more of its gasoline to not less than 25 retail dealers, it does not qualify for a gasoline jobber’s license. Because NYFT does not produce, refine, manufacture or blend motor fuels, it is not entitled to a distributor’s license as a refiner of motor fuels. Because NYFT imports into New Jersey less than 50% of its total New Jersey handle, under the regulation at issue it is not entitled to a distributor’s license as an importer of motor fuels.
RAD is also a distributor of motor fuels and is registered and bonded by New York State and the federal government. RAD is a New Jersey-licensed distributor whose license was also cancelled by the Director, and the cancellation has been stayed pending the outcome of this litigation. It has facilities in New Rochelle, Glen Cove, Newburgh and Brooklyn, New York, and it stores motor fuel in approximately 25 facilities throughout Connecticut, New York and New Jersey. RAD sells to a wide range of customers, including large corporations and gasoline service stations in New York State and New York City. Its gross sales volume is approximately $150,000,000 a year. Although its principal business is supplying petroleum products to consumers, from time-to-time it also sells to other New Jersey-licensed distributors on a tax-free basis. Most of RAD’s business of buying and selling fuels is in New York State, although some occurs in Connecticut and New Jersey. RAD stores motor fuel in New Jersey, but imports by RAD into New Jersey are less than 1% of its total New Jersey handle, and RAD’s *35 distributor’s license would be cancelled if the Director were to enforce the 50% rule.
Century Resources Corporation of Tarrytown, New York, is a petroleum distributor and marketer. Century has a fuel oil terminal in Bridgeport, Connecticut and distributes gasoline to service stations located in New York and Connecticut. It is an active barge seller and buyer in the New York Harbor. At the time of trial, Century was a New Jersey-licensed distributor whose license was also cancelled by the Director, and this cancellation was stayed pending the outcome of this litigation. However, after trial, the court was informed that Century Resources Corp. had been sold and had relinquished its New Jersey distributor’s license, but the testimony presented by an officer of Century remains a part of the record of this case.
III.
Plaintiffs’ witness testified that there are three major world markets that trade finished petroleum products, Rotterdam, Houston and New York, and that the rapid expansion in the trading of these products since 1979 has been an important factor in the substantial decline in price that benefited all consumers. He stated that through an intricate network of traders, brokers and storage facilities, the products are sold and resold continuously and that the trading markets have been further expanded with the advent of the New York Mercantile Exchange, which trades futures in these finished products.
The New York Mercantile Exchange is a nonprofit New York corporation which is a federally-designated contract market for trading in commodity futures and option contracts. Dealing on the exchange in motor fuel futures contracts began in 1981. Its principal markets are energy futures contracts in crude oil, # 2 heating oil and unleaded gasoline. The basic unit of trade is a 42,000-gallon “futures” contract. A “futures” contract is a standardized contract for the purchase or sale of a commodity, which is traded for future delivery under the rules and regulations established by the Exchange. Approximately 40% *36 of the contracts are purchased by speculators and 60% by entities in the oil trade.
The exchange provides a forum or marketplace which establishes the free market price of petroleum products through an auction system. One of the primary functions of the exchange is to provide the value of the commodity traded, at any given moment in time. NYFT and other similar companies utilize the exchange in several ways: as a substitute for maintaining large physical inventories or any inventory at all; as a reliable source of supply of product, and as a hedge against increases or decreases in the price of motor fuel.
Trading in motor fuel contracts on the exchange has been a viable hedging tool for the entire world, reducing or eliminating the significant price risks inherent in the petroleum industry. The exchange is a major petroleum market in the eastern United States for trading product from the United States and abroad. The exchange provides an alternative form of supply and keeps the market competitive.
It is not necessary to hold a New Jersey distributor’s license to trade on the New York Mercantile Exchange. Trades on the exchange may be either on a tax-paid or a tax-free basis. All fuel is bought and sold for future delivery. When the delivery date arrives, the buyer and seller are matched through a computerized clearing system. If a trade is made on a tax-paid basis, the seller has paid the tax and the purchaser must include the tax in the price paid for the contract. When he takes delivery, the purchaser can then seek a refund from New Jersey if the motor fuel purchased is for export out of New Jersey. If the purchaser is matched with a tax-free seller, he does not have to go through the refund system.
In a letter in evidence dated March 6,1987, to the New Jersey Division of Taxation, Miscellaneous Tax Branch, Rosemary T. McFadden, President of the New York Mercantile Exchange, stated:
The difficulties which we foresee for the Exchange which might arise if many distributor licenses are cancelled due to the inability of the holders to comply with the fifty percent Rule are described below. Each of those potential *37 problems stem from one common source: in a cash market delivery, each participant can choose the partner with whom it will do business and, thus, through that freedom be able to maximize profits by transacting business ex-tax; in an exchange delivery, the participants are not able to choose the party to their transactions and, therefore, run the risk that if they are not matched favorably, profits can be lost or reduced because of the payment of the taxes.
The Exchange is concerned that a large reduction of the number of distributor licenses might cause the appearance or the fact of a significant economic difference between participating in deliveries on the Exchange as opposed to the cash market due to the potential risk that Exchange deliveries might involve a costly taxable event that could be avoided in the cash market. Such a perception by the trade might cause some among it to elect not to take part in Exchange deliveries or, worse, reduce their overall participation in the futures market. If that participation drops significantly, the liquidity and effectiveness of the market as a hedging mechanism might be reduced with adverse consequences being felt not only directly, by those who cease trading, but indirectly, by those who continue to trade.
With the above comments in mind, we request that the Division of Taxation, in developing Rules with respect to distributor licenses, consider the potential effects that the application of such Rules might have on futures trading in creating an unlevel playing field for market participants. In view of the Congressionally recognized public purpose which futures markets serve, we believe that consideration of those effects is most important.
A witness for plaintiffs stated that if traders on the exchange were not licensed by New Jersey to purchase tax-free, the exchange market would adjust, but it would lose the segment of the trade that keeps the market competitive. The witness testified that if his company lost its New Jersey distributor’s license and could only trade on a tax-paid basis, this would effectively preclude it and similarly-situated participants from using the exchange as an alternate form of supply. As a result, there would be 20 or fewer companies able to trade on the exchange in the New York Harbor market. This would decrease competition, hurt the small independent distributors, adversely affect trading in motor fuel contracts and probably hurt the consumer.
IV.
Director contends that because plaintiffs are neither importers as defined by N.J.A.C. 18:18-1.1, nor gasoline jobbers as defined by N.J.S.A. 54:39-6.1, they are not entitled to hold *38 either a distributor’s or a gasoline jobber’s license, and therefore, they may not buy and sell motor fuel free of tax, and when they purchase motor fuel in New Jersey, store it and then export it, plaintiffs must pay the tax to New Jersey and apply for a refund. The Director contends that the present system of licensing and taxation is necessary to prevent tax evasion.
The longer the chain of tax-free sales the more difficult it becomes for the State to find the sale which is taxable and verify that the tax has been paid. There is a practice referred to as a daisy chain in which a series of companies is formed to pass the motor fuel on paper among themselves. Somewhere in this chain, one of the transferees is the break-out company. This company makes a taxable sale and collects the tax from the purchaser, but does not pay the tax to the State. Prom that point down the chain, transactions are tax-paid. The greater the number of tax-free transactions, the more difficult it is to find the break-out company liable for the tax.
There is also a time factor. Enforcement is improved if the break-out company can be identified quickly. If it takes months to identify the break-out company, by the time it is identified the company often no longer exists. The 50% rule serves to limit the number of tax-free marketers, thereby limiting the number of transactions and aiding enforcement of the tax.
Plaintiffs contend that if they can no longer participate in the market on a tax-free basis and are forced to buy and sell on a tax-paid basis, their businesses will be severely affected, if not ruined, because they will not be able to compete in the export market against others who are selling on a tax-free basis. Although the tax paid will eventually be refunded, given the time value of money, the delay between the time the tax is paid and the refund is received will increase plaintiffs’ costs and result in a significant competitive disadvantage. Plaintiffs’ witness testified that the refund process takes 60 to 90 days and, in terms of the time value of money at 1987 interest rates, has been estimated to cost 3/io of a cent a gallon a month as *39 against normal profits of 5/io or G/io of a cent a gallon. The profit margins at the wholesale level are too small to support the cost of the tax refund procedure. The industry is highly competitive, and bids typically are won or lost in increments of tenths of a cent. Plaintiffs also contend that if they cannot trade in futures on the New York Mercantile Exchange on a tax-free basis, they will be precluded from participating in futures trading.
Plaintiffs’ witness testified that prior to the federal government removing motor fuel price controls in January 1981, there were a limited number of entities trading in the New York Harbor market, and this market had “the highest prices for energy we’ve ever paid in this country.” During the 1970’s, the New Jersey-New York metropolitan area suffered shortages of motor fuel caused by wars in the Middle East and the consequent boycotts that occurred during this period. Since that time, between 1978 and 1984, the number of companies licensed by New Jersey as distributors has tripled.
V.
Plaintiffs allege that the 50% rule and the cancellation of their distributors’ licenses discriminate against, and impose an unreasonable burden on, interstate commerce, in violation of the Commerce Clause of the United States Constitution.
The New York Harbor market is a multistate distribution and trading area for motor fuel. Because storage facilities are primarily in New Jersey, substantially all motor fuel used in the multistate area must first be brought to New Jersey and then exported to neighboring states. The New Jersey taxing system imposes a burden on those marketers not licensed to purchase tax free who purchase in New Jersey for export from the state or trade on the New York Mercantile Exchange. Although motor fuel exports are exempt from taxation by New Jersey under N.J.S.A. 54:39-28, the New Jersey motor fuel tax system requires payment of the tax on purchase in New Jersey and the filing of a claim for refund by a marketer who is not a licensed *40 distributor, but who purchases and stores motor fuel in New Jersey and then exports it. This refund procedure adds a cost to an export transaction. In a market where the normal profit margin is small, this additional cost makes it impossible for those marketers who must purchase motor fuel in New Jersey on a tax-paid basis to compete with those who may purchase on a tax-free basis. It is also the testimony in this case that purchasers on the New York Mercantile Exchange are not willing to purchase futures on a tax-paid basis because when the purchase is for export, the purchaser must reimburse the tax to the seller and seek a refund.
The burden of paying the tax on purchase and seeking a refund affects commerce between the states in two ways. It limits the number of marketers exporting motor fuel from New Jersey to other states, and limits trade in motor fuel futures on the New York Mercantile Exchange. Enforcement of the 50% rule burdens commerce by reducing the number of traders in the market and denying consumers the benefit of a competitive market in motor fuel, thereby impeding the free flow of motor fuel in interstate commerce.
The uncontroverted facts are:
1. Substantially all of the motor fuel used in New York is exported from New Jersey storage terminals.
2. If exported by distributors (refiners or 50% rule importers), it is tax-free.
3. If exported by others, tax must be paid to New Jersey on purchase and storage in New Jersey. To obtain a refund of New Jersey motor fuel tax, the exporter must make application and wait several months for a refund. In addition, a tax at the time of import must be paid to New York.
4. The procedure for obtaining a refund adds a substantial cost compared to the small profit margin. Therefore, exporters who must purchase on a tax-paid basis cannot compete with exporters who are permitted to purchase on a tax-free basis.
*41 5. The additional cost of the refund procedure will force out of business those smaller marketers engaged in exporting from New Jersey who cannot purchase tax free, thereby lessening competition.
6. The inability of a number of smaller marketers to sell motor fuel futures on a tax-free basis on the New York Mercantile Exchange will limit trading on that exchange and adversely affect the New York Harbor market.
The Director does not contest the truth of any of the foregoing, responding that limiting tax-free sales to refiners and those importers who comply with the 50% rule substantially reduces the number of entities able to sell tax free, and that this makes enforcement of the tax more efficient and lessens tax evasion. However, there is no indication from the testimony that motor fuel tax collection, with 155 entities currently permitted tax-free purchases, presents any serious enforcement problems.
In Freeman v. Hewit, 329 U.S. 249, 67 S.Ct. 274, 91 L.Ed. 265 (1946), the Supreme Court, dealing with a Commerce Clause challenge to a state tax, stated:
[T]he Commerce Clause was not merely an authorization to Congress to enact laws for the protection and encouragement of commerce among the States, but by its own force created an area of trade free from interference by the States. In short, the Commerce Clause even without implementing legislation by Congress is a limitation upon the power of the States. [Id., 329 U.S. at 252, 67 S.Ct. at 276]
This limitation on state power “does not merely forbid a State to single out interstate commerce for hostile action. A State is also precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States.” Ibid.
Through the years, the Supreme Court has expressed the Commerce Clause limitation upon the states in a variety of ways, dealing with statutes or regulations which favor intrastate business activity (economic protectionism) and with statutes or regulations which burden the free flow of trade between states. Where the Court has found economic protection *42 ism, it has applied a rule of per se invalidity. See Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 36, 100 S.Ct. 2009, 2015, 64 L.Ed.2d 702 (1980) (quoting Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2351, 2535, 57 L.Ed.2d 475 (1978)). However, where a state regulation does not favor local commerce over interstate commerce but does impose a burden on interstate commerce, the controlling question is whether that burden is “clearly excessive in relation to the local putative benefits.” Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 474, 101 S.Ct. 715, 728, 66 L.Ed.2d 659, reh’g den. 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981) (quoting Pike v. Bruce Church, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)). The stipulated facts in the subject case indicate that the New Jersey motor fuel tax scheme promotes better utilization of New Jersey facilities and makes more distributors available in more areas of the state at a lower cost to New Jersey consumers. Although it may be argued that the motor fuel tax promotes New Jersey markets and contains a quantum of economic protectionism, the most significant effect.of the New Jersey motor fuel tax system is the burden it imposes on interstate commerce. Therefore, the extent of the burden that will be tolerated depends “on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.” Pike v. Bruce Church, supra.
The New Jersey motor fuel tax collection system was modified to its present form in 1950, and the 50% rule became effective in 1969. However, it was not until 1984 that the Division of Taxation first attempted to enforce the 50% rule. Between 1950 and 1984, the structure of the interstate motor fuel market changed drastically. Specifically, during the 1970’s, the New York Harbor area suffered shortages in motor fuel caused by wars in the Middle East and consequent boycotts. In the late 1970’s and early 1980’s, many new companies entered the motor fuel distribution business in the New York Harbor area. In 1954 there were 36 licensed distributors. This number increased beginning in 1972, reaching a high of 155 in *43 1984. The entry of these smaller marketers created a competitive market, prevented price gouging and, through their participation in the New York Mercantile Exchange, ensured the free flow of motor fuel and stabilized motor fuel prices by providing a viable hedging tool.
The motor fuel market is no longer an oligopoly. It is now more competitive and more stable. The recent attempt to enforce the 50% rule has emphasized the change in the market and the fact that the New Jersey motor fuel tax system has not adapted to the market changes which have occurred over the past two decades. Enforcement of the 50% rule would eliminate those marketers responsible for the more stable competitive market and would severely burden interstate commerce.
There is no evidence that the Division had difficulty collecting the motor fuels tax when it was not enforcing the 50% rule, or that there are any serious tax enforcement problems. There is also no evidence that the 50% import requirement is the only means of achieving the Director’s tax-collection and tax-evasion objectives.
Defendant relies in part on Exxon v. Maryland, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91, reh’g den. 439 U.S. 884, 99 S.Ct. 232, 233, 58 L.Ed.2d 200 (1978), to support its argument that the 50% rule does not violate the Commerce Clause by discriminating against interstate commerce or unduly burdening commerce between the states. The Maryland Legislature concluded that the gasoline shortage in that state in 1973 was due to inequitable distribution of gasoline among service stations because producers and refiners favored their company-operated service stations. The Legislature enacted a statute prohibiting producers and refiners from operating retail service stations in Maryland and requiring them to extend all “voluntary allowances” uniformly to all service stations supplied by them. The United States Supreme Court, noting that only 5% of the service stations in the state were company-operated, held that the statute did not discriminate against interstate commerce or *44 impose an impermissible burden on interstate commerce. The Court found that:
In fact, the Act creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market. The absence of any of these factors fully distinguishes this case from those in which a state has been found to have discriminated against interstate commerce. [98 S.Ct. at 2214]
Noting that the number of stations actually operated by a refiner or an affiliate is relatively small, representing about 5% of the total number of Maryland retailers, id. at 2212, the Supreme Court found
no reason to assume that their share of the entire supply will not be promptly replaced by other interstate refiners. The source of the consumers’ supply may switch from company-operated stations to independent dealers, but interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another. [Id. at 2214]
The Exxon Court upheld Maryland’s right to regulate the retail sale of gasoline within the state as not being a burden on interstate commerce.
The regulation in the subject case differs significantly from the statute in Exxon because the regulation impacts directly on interstate commerce, whereas the statute in Exxon affects only intrastate commerce. Although the producers and refiners in Exxon were also engaged in interstate commerce, the burden of the statute fell equally on the intrastate activities of all refiners and producers. In the subject case, the challenged regulation causes the burden to fall unequally on those exporters who cannot purchase tax-free, thus affecting commerce between states involved in the New York Harbor market by restricting the flow of goods in interstate commerce. Further in the present case, far more than 5% of the participants in the market will be eliminated if the 50% rule is enforced.
There would appear to be other means of preventing tax evasion that would not unduly burden interstate commerce and provide a level playing field for those who compete in the New *45 York Harbor market. For instance, motor fuel purchases in New Jersey by out-of-state marketers for export could be permitted on a tax-free basis, or interest could be paid on tax refunds on exports, or all exports, including those by licensed distributors and gasoline jobbers, could be required to be on a tax-paid basis, or the definition of importer could be broadened to include one who purchases from a pipeline company or refiner and stores in New Jersey prior to export or sale on the New York Mercantile Exchange.[8]
Further, because plaintiffs are not refiners and have no reason to be major importers into New Jersey, and cannot qualify as gasoline jobbers because they do not regularly make 95% or more of their sales in New Jersey, under the 50% rule they are excluded from purchasing and trading on a tax-free basis. By favoring major intrastate marketers, the Director’s action in enforcing the rule appears to have elements of economic protectionism. I do not have to rely on economic protectionism, however, because I find that there is sufficient evidence to conclude that the effect of the 50% rule unreasonably burdens interstate commerce. Therefore, to the extent that the rule excludes some interstate marketers from first-tier, tax-free, purchase and trading, the rule is in violation of the Commerce Clause of the United States Constitution.
I therefore conclude that the Director may not cancel plaintiffs’ distributors’ licenses for failure to comply with the 50% rule. In view of the court’s decision, it is unnecessary to reach plaintiffs’ due process and equal protection arguments. Judgment will be entered in favor of plaintiffs.

The first gasoline tax law in New Jersey was enacted in 1927, imposing a $.02 a gallon tax. The motor fuel tax collection system was revised in 1935 and modified to its present form in 1950. Effective July 1, 1988 this tax is increased to $.10 a gallon. L. 1987, c. 460.

"An 'importer' is a person who brings fuel into this state from outside this state in his own vehicles, or who hires a common carrier to transport the product and who has full ownership, possession, control, custody and direction of the fuel while in transit into this state. In order to obtain and hold a Distributor’s License on the basis of the importation of motor fuels into this state, such person must regularly import 50 percent or more of the total amount of motor fuels handled by him in this state." Letter of Sidney S. Simon, Supervisor to RAD Oil Company, Inc. (May 9, 1979). “[G]allonage handled means the total gallons imported plus the total gallons on which title was obtained in New Jersey." Letter of Sidney S. Simon, Supervisor to NYFT (November 29, 1982). “Motor fuels handled” is also referred to as "the handle."

SaIes on a tax-free basis involve no tax liability on the seller or the purchaser. Sales on a tax-paid basis require the seller to collect the tax from the purchaser. If the seller did not pay the tax at the time he purchased the motor fuel, he must remit the tax to the Division of Taxation; otherwise, he retains the amount of the tax. In this way, ultimately the motor fuel tax is borne by the final consumer.

See statement attached to the bill subsequently enacted as L. 1950, c. 144.

Some jurisdictions impose the tax on the first sale. Recently, the federal government has adopted the first-sale system for the collection of federal excise tax on gasoline. 26 U.S.C.A. § 4091, as revised December 22, 1987.

The year in which enforcement of the 50% rule began.

A condition of the agreement between NYFT and Citgo is that NYFT must be a New Jersey-licensed distributor.

A bill pending in the New Jersey Legislature, Senate Bill 363, presents an example of an alternative motor fuel tax collection system. This bill proposes to revise the system of motor fuel tax collection and enforcement. This proposed legislation would include the creation of a separate importer license which would not require that a minimum quantity of motor fuel be imported, thereby permitting any importer to purchase motor fuel in New Jersey on a tax-free basis.