86 N.Y.2d 165 (1995)
654 N.E.2d 954
630 N.Y.S.2d 680
In the Matter of Orvis Company, Inc., Respondent-Appellant,
v.
Tax Appeals Tribunal of the State of New York et al., Respondents, and Commissioner of the New York State Department of Taxation and Finance, Appellant-Respondent.
In the Matter of Vermont Information Processing, Inc., Respondent,
v.
Tax Appeals Tribunal of the State of New York, Respondent, and Commissioner of Taxation and Finance of the State of New York, Appellant.
Court of Appeals of the State of New York.
Argued April 27, 1995.
Decided June 14, 1995.
Dennis C. Vacco, Attorney-General, Albany (Daniel Smirlock, Jerry Boone and Peter H. Schiff of counsel), for appellant-respondent in the first above-entitled proceeding.
Brann & Isaacson (George S. Isaacson and David W. Bertoni, of the Maine Bar, admitted pro hac vice, of counsel), and Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo (Paul R. Comeau and Robert D. Plattner of counsel), for respondent-appellant in the first above-entitled proceeding.
Dennis C. Vacco, Albany (Daniel Smirlock, Jerry Boone, Peter H. Schiff and Victoria A. Graffeo of counsel), for appellant in the second above-entitled proceeding.
DeGraff, Foy, Holt-Harris, Mealey & Kunz, Albany (James H. Tully, Jr., and Peter G. Barber of counsel), for Vermont Information Processing, Inc., respondent in the second above-entitled proceeding.
Alan Friedman and June T. Summers, of the District of Columbia Bar, admitted pro hac vice, for Miltistate Tax Commission, amicus curiae in the first and second above-entitled proceedings.
Chief Judge KAYE and Judges SIMONS, TITONE and SMITH concur with Judge LEVINE; Judge BELLACOSA dissents and votes to affirm in a separate opinion in which Judge CIPARICK concurs.
*169 LEVINE, J.
On these appeals, the State Commissioner of Taxation and Finance seeks to overturn two decisions of the Appellate Division[1] holding that Vermont vendors of products purchased by New Yorkers for use in this State were immunized from the duty to collect State compensating use taxes (Tax Law § 1110) under the Commerce Clause (US Const, art I, § 8) of the Federal Constitution. Petitioner Orvis Company, Inc. (Orvis) sells, at both retail and wholesale, camping, fishing and hunting equipment, casual and outdoor clothing and food and various gift items. Orvis' retail sales were almost entirely through mail-order catalog purchases shipped from Vermont by common carrier or the United States mail. Orvis also sold merchandise at wholesale to New York retail establishments. Concededly, Orvis employees visited New York retailers to whom it sold merchandise during the three-year audit period.
Relying upon Quill Corp. v North Dakota (504 US 298), the Appellate Division held that in the absence of a substantial physical presence by Orvis personnel in New York, the imposition of the duty to collect use taxes from its New York mail-order *170 purchasers contravened the Commerce Clause. The Court concluded that Orvis' "sporadic activities in New York" failed to meet the substantial physical presence standard and, therefore, the assessment of the tax was invalid (204 AD2d, at 918).
Petitioner Vermont Information Processing, Inc. (VIP) markets computer software and hardware to beverage distributors in New York and elsewhere throughout the United States. In most instances, its customers' orders were filled through shipments by common carrier or United States mail. An audit of VIP's invoices and sales records, however, showed visits by its employees to New York customers to resolve problems and give additional instructions in connection with the use of VIP software programs, and occasionally for installing software. The Appellate Division again concluded that those activities were insufficient to constitute the requisite substantial physical presence of VIP in this State and annulled the determination assessing the tax.
We do not read Quill Corp. v North Dakota to make a substantial physical presence of an out-of-State vendor in New York a prerequisite to imposing the duty upon the vendor to collect the use tax from its New York clientele. The Appellate Division erroneously applied that exacting standard in both cases.

I.
The true holding of Quill Corp. v North Dakota can best be understood by considering the case in the context of its position in the evolution of Supreme Court doctrine limiting the authority of a State to assess or impose a duty to collect taxes arising out of the economic activity of a foreign business engaged in interstate commerce. The constitutional limitations on such authority have been derived from two sources. The first is the Due Process Clause of the Fourteenth Amendment of the US Constitution, pertaining to the jurisdiction to tax, or the "taxing power", of a State (Wisconsin v Penney Co., 311 US 435, 445). The second source is the so-called "dormant" or "negative" Commerce Clause, by virtue of which the constitutional grant of power to Congress "[t]o regulate commerce * * * among the several States" (US Const, art I, § 8, cl [3]) has been interpreted as implicitly prohibiting, even in the absence of Congressional regulation, unduly burdensome or discriminatory State taxation of transactions or entities engaged *171 in interstate commerce (see, Oklahoma Tax Commn. v Jefferson Lines, 514 US ___, ___, 115 S Ct 1331, 1335-1336 [Apr. 3, 1995]; Quill Corp. v North Dakota, 504 US, at 309, supra).
Under its Due Process Clause analysis, the Supreme Court has fashioned a requirement that, for a State to validly tax an interstate commercial activity, there must be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax" (Miller Bros. Co. v Maryland, 347 US 340, 344-345; see, Moorman Mfg. Co. v Bair, 437 US 267, 272).
As to Commerce Clause challenges, one strand of earlier cases applied a formalistic approach prohibiting the imposition of what the Court deemed a "direct" tax on interstate commerce (see, Spector Motor Serv. v O'Connor, 340 US 602; Freeman v Hewit, 329 US 249). Except for such taxes found to directly burden interstate commerce, the Court recognized that the Commerce Clause did not "relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business" (Western Live Stock v Bureau, 303 US 250, 254). Accordingly, other forms of nondiscriminatory taxation on interstate transactions were permitted. A nexus was required, however, between the taxing State and the entity, property or activity it sought to tax.
Little difficulty was encountered in finding the required local nexus with respect to sales and compensating use taxes. In McGoldrick v Berwind-White Co. (309 US 33), the vendor's responsibility to collect the tax on the sale of coal by a Pennsylvania producer to a New York City purchaser was upheld because "the tax is conditioned upon a local activity, delivery of goods within the state upon their purchase for consumption" (id., at 58 [emphasis supplied]).
Until Quill Corp. v North Dakota, the constitutionally required nexus between the taxing State and the activity, entity or property subject to the tax was applied indistinguishably for purposes of both Due Process and Commerce Clause analysis, i.e., a definite link or minimum connection (see, National Bellas Hess v Department of Revenue, 386 US 753, 756-757; Scripto v Carson, 362 US 207, 210-211). Some physical presence of the vendor in the taxing State was noted as a factor justifying the imposition of the sales and use tax collection obligation. In Felt & Tarrant Co. v Gallagher (306 US 62) that presence was found in the foreign seller's engagement of two *172 nonemployee, commissioned sales agents to solicit orders and the rental of office space for them. In Scripto v Carson (supra), 10 wholly commissioned, nonemployee, "advertising specialty brokers" (id., at 209), retained on a part-time, nonexclusive basis to solicit sales, constituted a sufficient physical connection.
In National Bellas Hess v Department of Revenue (386 US 753, supra), the Court for the first time explicitly made some physical presence of the vendor in the taxing State a requirement under both the Commerce and Due Process Clauses for charging the vendor with the duty of collecting a use tax on mail-order purchases by residents of that State. Physical presence within the taxing State was required, irrespective of the degree to which the vendor may have availed itself of the benefits and protection of the taxing State in other ways, such as by "regularly and continuously engag[ing] in `exploitation of the consumer market' of [that State]" (id., at 762 [Fortas, J., dissenting] [quoting Miller Bros. Co. v Maryland, supra]). In Bellas Hess, the vendor's patronage in the taxing State was exclusively through mail-order purchases, and its only contact with its customers was by way of the United States mails or by common carrier.
The Court in Bellas Hess gave three reasons for requiring the vendor's physical presence in the taxing State: (1) without some physical presence, there would be no fair basis for making interstate commerce bear a share of the cost of local government; (2) a contrary rule would require the Court "to repudiate totally the sharp distinction", relied upon by State taxing authorities, between mail-order sellers with local outlets or solicitors and "those who do no more than communicate with customers in the State by mail or common carrier as part of a general interstate business" (386 US, at 758 [emphasis supplied]); and (3) permitting imposition of the duty of collection of the tax in that case would subject national mail-order businesses to oppressive administrative and record-keeping burdens "in a virtual welter of complicated obligations to local jurisdictions with no legitimate claim to impose `a fair share of the cost of the local government'" (id., at 759-760).
As reflected in the cases following Bellas Hess, the requirement of the vendor's physical presence in the taxing State was not unduly exacting. In Standard Steel Co. v Washington Revenue Dept. (419 US 560), the Court upheld the assessment of a Washington State gross receipts tax on a foreign vendor's *173 sales to the Boeing Company against Due Process and Commerce Clause challenges. The Court found a sufficient vendor's physical presence in the State to justify the tax in the person of a single resident engineer-employee who operated out of his home in Seattle and whose responsibilities were to consult with Boeing on anticipated needs for the vendor's parts in Boeing's aircraft manufacturing process and to follow up on shipping or other problems in using the vendor's product (id., at 562-563). In Goldberg v Sweet (488 US 252), at issue was Illinois' imposition of a 5% excise tax on interstate telephone calls which the taxing statute required to be collected by long-distance telephone carriers, such as GTE Sprint Communications (Sprint), through their billings. Sprint challenged the tax, but it and the other parties did not contest (and the Court agreed) that the local nexus requirement was met because the tax was restricted to telephone calls originating or terminating in Illinois and charged to an Illinois service address (id., at 263). In concluding that a sufficient local nexus existed, the Court did not inquire further into the extent of Sprint's physical presence in the State.
Two other decisions are significant for their articulation of the criteria to determine whether a given tax imposed on interstate commercial activity passes constitutional muster under the Commerce Clause. In Complete Auto Tr. v Brady (430 US 274), the Court repudiated the artificial and confusing formalistic distinction between direct and indirect taxes on interstate commerce, and overruled Spector Motor Serv. v O'Connor (supra) and Freeman v Hewit (supra). It explicitly confirmed its agreement with the approach of the alternative line of decisions (some of which we have discussed), such as Western Live Stock v Bureau (303 US 250, supra). The Court characterized those decisions as having "considered * * * [the] practical effect [of the taxing statute] and * * * sustained [the] tax * * * when the tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State" (430 US, at 279). The Complete Auto articulation of the four-pronged standard for determining the validity of a State tax on interstate commercial activity under the dormant Commerce Clause remains the prevailing test, with refinements, to this day (see, Oklahoma Tax Commn. v Jefferson Lines, 514 US, at ___, 115 S Ct, at 1337, supra).
One such refinement of Complete Auto was made at the *174 same term in National Geographic v California Equalization Bd. (430 US 551). There the Court upheld a use tax collection obligation with respect to interstate mail-order sales of the Society from its District of Columbia home office, on the basis of the physical presence of two National Geographic magazine advertising sales offices in the taxing State. The Court made two significant rulings: (1) the required nexus with the taxing State need not necessarily be directly related to the activity being taxed, "but [could] simply [be] whether the facts demonstrate `some definite link, some minimum connection, between [the taxing State and] the person . . . it seeks to tax'" (id., at 561 [quoting Miller Bros. Co. v Maryland, supra] [emphasis in original]); and (2) the required physical presence of the vendor in the taxing State must be more than the " `slightest presence'" (id., at 556).

II.
It is with the foregoing decisional evolution of negative Commerce Clause doctrine by the Supreme Court in mind that we turn to Quill Corp. v North Dakota (504 US 298, supra). Quill Corp., like National Bellas Hess, involved a vendor exclusively engaged in a mail-order business with substantial patronage in the taxing State, but whose only connection with its customers in that State, was by common carrier or the United States mail. The Supreme Court of North Dakota held, nonetheless, that social, technological, economic, commercial and legal changes since Bellas Hess was decided rendered the holding in that case obsolete. The North Dakota court concluded that physical presence was no longer necessary in the case of a mail-order vendor who systematically directed its marketing efforts at the taxing State. The State Supreme Court pointed out that North Dakota had expended significant resources to create and nurture an economic climate supporting a demand for Quill's products, had provided a legal infrastructure that protected and secured Quill's financial interests, and had disposed as waste many tons of Quill's catalogs and promotional materials mailed to the State. Therefore, the North Dakota Supreme Court reasoned, the Commerce Clause should not bar making Quill pay its fair share for those benefits and protections it received from the State. The United States Supreme Court noted that it was thus confronted with a pull in one direction from the approach emphasized in Complete Auto Tr. adjudging a State tax *175 for Commerce Clause purposes based upon economic realities and practical effects, and the opposing magnetism of stare decisis. "Having granted certiorari * * * we must either reverse the State Supreme Court or overrule Bellas Hess. While we agree with much of the State Court's reasoning, we take the former course" (504 US, at 301-302 [emphasis supplied]).
In actuality, however, the Supreme Court in Quill adopted a middle course. It overruled so much of Bellas Hess as required some physical presence of the vendor as a "minimum connection" in the taxing State to support the jurisdiction to tax under the Due Process Clause (504 US, at 306, 307-308).[2] However, the Supreme Court in Quill elected to adhere to the Bellas Hess precedent requiring some physical presence of an interstate mail-order vendor in the taxing State for validity under the Commerce Clause. This course was not adopted without some apparent reluctance. Thus, the Court stated that, "[w]hile contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today, Bellas Hess is not inconsistent with Complete Auto" (504 US, at 311). It further stated, "[a]lthough we agree with the state court's assessment of the evolution of our cases, we do not share its conclusion that this evolution indicates that the Commerce Clause ruling of Bellas Hess is no longer good law" (504 US, at 314 [emphasis supplied]).
The rationale of the Supreme Court in Quill for continuing to require the physical presence of the vendor in the taxing State, however, was not the same primarily relied upon in Bellas Hess, that only by requiring a physical presence in the taxing State can the vendor justifiably be called upon to pay its fair share of the cost of local government. The Supreme Court agreed with the North Dakota Supreme Court's conclusion that, under the more "flexible" approach of current Commerce Clause jurisprudence (504 US, at 314), the quid pro quo for State taxation could be found in the benefits and protections the State confers in providing for a stable and secure legal-economic environment for a mail-order vendor's substantial marketing efforts aimed at the taxing State. Rather, the justification for continuing to require a physical presence of the vendor in the taxing State was based on two *176 other grounds. First, Bellas Hess furthers the ends of the Commerce Clause by furnishing a " `bright-line' test[ ]" (504 US, at 314), a "demarcation of a discrete realm of commercial activity that is free from interstate taxation" (id., at 315). The Bellas Hess rule, thus, serves to assure tax immunity to "vendors `whose only connection with customers in the [taxing] State is by common carrier or the United States mail' " (id., at 315 [emphasis supplied]). Such a bright-line demarcation benefits national commerce by avoiding the litigation-provoking controversy and confusion of imprecise constitutional standards, and fosters investment by settling expectations (id.). Second, adherence to the Bellas Hess physical presence requirement satisfies the especially applicable demands of stare decisis. "[T]he Bellas Hess rule has engendered substantial reliance and has become part of a basic framework of a sizable industry. The `interest in stability and orderly development of the law' that undergirds the doctrine of stare decisis' * * * therefore counsels adherence to settled precedent" (504 US, at 317).

III.
As the foregoing discussion demonstrates, both the literal language of the Quill decision and consideration of its place in the evolution of Supreme Court Commerce Clause jurisprudence refute the Appellate Division's conclusion, urged by Orvis and VIP here, that "Quill * * * increased the requisite threshold of in-State physical presence from any measurable amount of in-State people or property to substantial amounts of in-State people or property" (204 AD2d, at 917 [emphasis supplied]). Quill simply cannot be read as equating a substantial physical presence of the vendor in the taxing State with the substantial nexus prong of the Complete Auto test, as the Appellate Division's interpretation would require.
First, neither in Bellas Hess nor in the cases preceding it, or succeeding it up to Quill did the Court express any insistence that the physical presence of the interstate vendor be substantial for a valid taxation of sales of or imposition of a use tax collection duty upon the vendor. Bellas Hess itself, in requiring the vendor's physical presence, explicitly stated that it was applying a definite link or minimum connection requirement, which was the then prevailing nexus standard for both Due Process and Commerce Clause analysis in interstate commerce taxation cases (see, 386 US, at 756-757, supra). *177 Surely as a matter of simple logic and semantics, the Supreme Court was not applying a substantial physical presence requirement when it upheld the State tax on the in-State activity of the interstate vendor in the following cases: Felt & Tarrant Co. v Gallagher (306 US 62, supra) (two nonemployee, commissioned sales solicitors); Scripto v Carson (362 US 207, supra) (10 part-time, nonemployee, nonexclusive, commissioned sales brokers); Standard Steel Co. v Washington Revenue Dept. (419 US 560, supra) (one engineer-consultant operating an office out of his home); Goldberg v Sweet (488 US 252, supra) (an interstate long-distance telephone carrier's billing to an in-State service address for calls originating or terminating in the taxing State).
As we have shown from the Court's own expressions in Quill, rather than expanding upon the Bellas Hess minimum connection physical presence requirement, the Quill decision cannot be substantively construed as other than a somewhat begrudging retention of the Bellas Hess physical presence requirement  a "result", as the Court in its opinion remarked, "not dictate[d] * * * were the issue to arise for the first time today" (Quill Corp. v North Dakota, 504 US, at 311, supra).
Even more importantly, acceptance of the thesis urged by Orvis and VIP  that Quill made the substantial nexus prong of the Complete Auto test an in-State substantial physical presence requirement  would destroy the bright-line rule the Supreme Court in Quill thought it was preserving in declining completely to overrule Bellas Hess. Inevitably, a substantial physical presence test would require a "case-by-case evaluation of the actual burdens imposed" (504 US, at 315) on the individual vendor involving a weighing of factors such as number of local visits, size of local sales offices, intensity of direct solicitations, etc., rather than the clear-cut line of demarcation the Supreme Court sought to keep intact by its decision in Quill. Thus, ironically, the interpretation of Quill urged by the vendors here would undermine the principal justification the Supreme Court advanced for its decision in that case, the need to provide certainty in application of the standard and with it, repose from controversy and litigation for taxing States and the nearly $200 billion-a-year mail-order industry, with respect to sales and use taxes on interstate transactions.
Finally, confirmation that the Supreme Court never intended to elevate the nexus requirement to a substantial *178 physical presence of the vendor can be found in Oklahoma Tax Commn. v Jefferson Lines (514 US ___, 115 S Ct 1331, supra), the Supreme Court's most recent pronouncement in the interstate sales and use tax field. In that case, the Court did not apply a substantial physical presence test, but instead strictly utilized the substantial nexus prong of the Complete Auto test without even passing reference to the substantiality of the physical presence of the vendor (an interstate bus company) in the taxing State. Relying upon landmark cases decided before Quill, the Court focused on the in-State activity involved in the taxed transaction, such as the site of the origination or consummation of the transaction the State sought to tax (see, id., 514 US, at ___, 115 S Ct, at 1338 [citing McGoldrick v Berwind-White Co., 309 US 33, supra; Goldberg v Sweet, 488 US 252, supra]). "Oklahoma is where the ticket is purchased, and the service originates there. These facts are enough for concluding that `[t]here is "nexus" aplenty here' " (id., 514 US, at ___, 115 S Ct, at 1338).
We think the foregoing survey of the decisional law discloses the true import of the physical presence requirement within the substantial nexus prong of the Complete Auto test under contemporary Commerce Clause analysis. While a physical presence of the vendor is required, it need not be substantial. Rather, it must be demonstrably more than a "slightest presence" (see, National Geographic v California Equalization Bd., 430 US 551, 556, supra). And it may be manifested by the presence in the taxing State of the vendor's property or the conduct of economic activities in the taxing State performed by the vendor's personnel or on its behalf.

IV.
Applying the foregoing standard for a vendor's physical presence in the taxing State we think is required under Quill Corp. and Bellas Hess, we conclude that there was substantial evidence to support the State Tax Appeals Tribunal's determination that the activity of Orvis and of VIP in this State were sufficient to impose the obligation to collect compensating use taxes on their taxable retail sales to New York customers. Neither Orvis nor VIP sustained its definite burden of establishing immunity under the Commerce Clause from that tax collection obligation (see, General Motors v Washington, 377 US 436, 441; Norton Co. v Department of Revenue, 340 US 534, 537), nor their general burden under our case law of proving *179 sufficient facts to overcome an assessment and to demonstrate that the determination of the State Tax Appeals Tribunal was clearly erroneous (Matter of Grace v New York State Tax Commn., 37 N.Y.2d 193, 195-196).
In a March 1981 written response to an inquiry from a State Sales Tax auditor, Orvis' treasurer described its operations in New York as follows: "Some salesmen who reside in Vermont travel into New York to call on non-Orvis owned stores. The salesmen in no way bind the Orvis Company; all orders are approved in Vermont." A subsequent audit of Orvis' records disclosed that during the three years under audit, Orvis' annual sales to New York customers varied from $1 million to $1.5 million, about 15% of which consisted of wholesale purchases made by from 9 to 16 unaffiliated New York retail establishments. Contrary to the holding of the Appellate Division, the foregoing evidence supported a reasonable inference by the Tax Appeals Tribunal that Orvis' substantial wholesale business in this State was generally accomplished by means of its sales personnel's direct solicitation of retailers through visits to their stores in New York, subject only to approval of all orders in Vermont.[3] This sales activity in New York would presumptively suffice as a nexus to impose a use tax collection responsibility (see, Felt & Tarrant Co. v Gallagher, 306 US 62, supra; see also, National Geographic v California Equalization Bd., 430 US 551, supra [required vendor's presence need not directly relate to the taxed activity]).
It was not unreasonable for the Tribunal to give little if any weight to the affidavits Orvis submitted of its president and treasurer averring that there were only 12 visits to New York retailers by Orvis personnel during the audit period and not for the purposes of sales promotion but only to discuss problems such as concerning shipping and to check on how Orvis products were displayed. It is true, as noted by the Appellate Division, that the Regulations of the State Department of Taxation and Finance authorize the submission of affidavits in *180 lieu of oral testimony (see, 20 NYCRR 3000.10 [d] [1]). The existence of the regulation did not, however, prevent the Tribunal from rejecting the credibility of the affidavits submitted under the circumstances presented in this case. The fact is, on the crucial issue in this litigation, Orvis declined to expose its witnesses to cross-examination by producing them at the hearing before the State Tax Appeals Tribunal. As the Tribunal also noted in discrediting the affidavits, their description of the purposes of Orvis contacts with retailers in this State was indeed inconsistent with the admissions against Orvis' interest contained in its initial response to the inquiry of New York taxing authorities. The Tribunal, in relying on the foregoing factors did not act arbitrarily or capriciously in concluding that the Orvis affidavits lacked credibility.
Moreover, the affidavits of Orvis' officers described the trips to New York of Orvis personnel as "in a loop", suggesting systematic visitation to all of its as many as 19 wholesale customers on the average of four times a year. This demonstrably exceeded the "slightest presence" of Orvis in New York (National Geographic v California Equalization Bd., supra). Without even a credible let alone cogent explanation of why the March 1981 portrayal of Orvis' sales activity physically occurring in New York was inaccurate, the State Tax Appeals Tribunal was not arbitrary or capricious in concluding that Orvis failed to meet its burden of demonstrating its constitutional immunity. We have also considered Orvis' additional objections to the assessment and penalties imposed and find them equally unpersuasive. However, additional arguments raised by Orvis to the Appellate Division, and not considered by that Court, need to be remitted to that Court for its disposition. Also before us is Orvis' cross appeal to this Court seeking recovery of attorney's fees. Inasmuch as Orvis has not succeeded on the merits of its constitutional challenge to the tax assessment, it has no entitlement to such fees.
There likewise was substantial evidence to support the Tax Appeals Tribunal's determination upholding the sales and use tax assessment against VIP. Evidence was submitted from which the Tribunal could reasonably infer that VIP's hardware and software sales agreements obligated it to provide a charge-free visit of a VIP computer software installer at its beverage-distributor customer's site in New York if problems necessitating the visit occurred within the first 60 days of installation. Moreover, VIP's invoices showed charges for travel expenses to its New York customers' locations on 41 *181 occasions, in order to resolve the more intractable problems involving its computer hardware and software, during the three-year audit period, in which VIP had 154 taxable transactions in New York. There was ample support in the record for the State Tax Appeals Tribunal's finding that VIP's trouble-shooting visits to New York vendees and its assurances to prospective customers that it would make such visits enhanced sales and significantly contributed to VIP's ability to establish and maintain a market for the computer hardware and software it sold in New York. VIP's activities in New York were, thus, definite and of greater significance than merely a slightest presence (see, Standard Steel Co. v Washington Revenue Dept., 419 US 560, 562, supra [in-State presence of a single employee of vendor "made possible the realization and continuance of valuable contractual relations between (the interstate vendor and its customer)"]). As with Orvis, we find VIP's additional objections to the assessment and penalties equally without merit.
Accordingly, the judgment in Matter of Orvis Co. v Tax Appeals Tribunal should be modified in accordance with the opinion herein, and the matter remitted to the Appellate Division for consideration of issues raised but not reached at that Court. The judgment in Matter of Vermont Information Processing v Tax Appeals Tribunal should be reversed, and the determination of respondent Tax Appeals Tribunal reinstated and confirmed and the petition dismissed, with costs.
BELLACOSA, J. (dissenting).
Because we agree with the Appellate Division's grant of the respective petitions to annul the determinations of the Tax Appeals Tribunal, we respectfully dissent and vote to affirm in each case.
The Court is unanimous that the governing constitutional standard is "substantial nexus" of the taxpayer's business activities to the taxing State and not "substantial physical presence." Judge Ciparick and I conclude, however, that the minuscule, infrequent activities in New York by the two Vermont vendors do not satisfy the "substantial nexus" threshold requirement imposed by the Commerce Clause of the United States Constitution (art I, § 8, cl [3]), and the governing interpretations promulgated by the United States Supreme Court.
It seems to us that the majority's articulation miscasts the evolution of United States Supreme Court Commerce Clause precedents and injects confusion when a "substantial nexus" *182 bright line has been the guiding hallmark and jurisprudential goal. Functionally and commercially, telling out-of-State businesses that they dare not dip their toes within New York's borders without incurring New York taxes is not the teaching of the United States Supreme Court cases. Rather, deterring interstate traffic in such respects by taxation is precisely what is forbidden under the mantle of the Commerce Clause. Thus, absent evidence of a "small sales force, plant, or office" (Quill Corp. v North Dakota, 504 US 298, 315), or "continuous local solicitation" (Scripto v Carson, 362 US 207, 211 [emphasis added]), within New York State, imposition of the taxes at issue should be unconstitutional.
The question devolves to whether Orvis Company, Inc. and Vermont Information Processing, Inc., businesses not authorized and not doing business in New York, nevertheless by their minimal acts or course of business venturings arising out of sporadic commercial transactions in New York, entangled themselves in New York State's wide taxing web.
A State may not tax the economic activity of a foreign business engaged in interstate commerce unless "the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State" (Complete Auto Tr. v Brady, 430 US 274, 279 [1977] [emphasis added]). The Supreme Court has repeatedly applied this principle in subsequent cases, most recently in Oklahoma Tax Commn. v Jefferson Lines (514 US ___, ___, 115 S Ct 1331, 1338 [Apr. 3, 1995]). The present cases turn solely on the first prong, i.e., whether New York has a substantial nexus with the interstate activities of these two Vermont businesses to sustain a New York State sales and use tax.
A precise appreciation and reflection of the precedential building blocks is essential in this highly technical field. In National Bellas Hess v Department of Revenue (386 US 753 [1967]), the State of Illinois sought to impose a use tax on National, a mail-order business with its principal place of business in Missouri. National did not own any real property, maintain an office, sales house or warehouse in Illinois, and it did not have any agents, salespeople or other type of continuous representation in Illinois. National's only link to Illinois was via the United States mail or a common carrier.
Under Illinois statute, National was required to collect and *183 pay to the State a tax imposed upon Illinois consumers who purchase the company's goods for use in the State. National argued that the tax created an unconstitutional burden upon interstate commerce. The Supreme Court ruled in favor of the putative taxpayer. The Court declared that "if Illinois can impose such burdens, so can every other State, and so, indeed, can every municipality, every school district, and every other political subdivision throughout the Nation" (id., at 759). In 1992, the Supreme Court ruled in Quill Corp. v North Dakota (504 US 298, supra) that Bellas Hess was still valid, operative and consistent with its decision in Complete Auto Tr. v Brady (430 US 274, supra).
Quill settled two important facets of the rules. First, the nexus requirements of the Due Process and Commerce Clauses are not the same. Thus, a foreign corporation may engage in "minimum contacts" to satisfy the Due Process Clause, but still lack "substantial nexus" to support a State's taxing reach under the Commerce Clause. Second, the imposition of the duty to collect sales and use taxes on a foreign corporation is subject to a physical presence or functional equivalent requirement. The Court stated:
"Like other bright-line tests, the Bellas Hess rule appears artificial at its edges: Whether or not a State may compel a vendor to collect a sales or use tax may turn on the presence in the taxing State of a small sales force, plant, or office. * * * This artificiality, however, is more than offset by the benefits of a clear rule. Such a rule firmly establishes the boundaries of legitimate state authority to impose a duty to collect sales and use taxes and reduces litigation concerning those taxes. * * * [A] bright line rule in the area of sales and use taxes also encourages settled expectations and, in doing so, fosters investment by businesses and individuals" (Quill, supra, at 315-316 [citations omitted]).
New York's approach, now approved by this Court in the instant two cases, contradicts that rationale, certainty and the bright-line approach. It allows businesses to be tax-nicked at the "edges." Notably, Quill excludes from interstate taxation commercial activities which are not based on the physical presence of a "small sales force, plant, or office" in the taxing State (id., at 315). Accordingly, sporadic sojourns into a State will not supply an adequate nexus to overcome the Commerce *184 Clause protection (compare, Miller Bros. Co. v Maryland, 347 US 340, 346-347 [a Due Process Clause case]).
We disagree with the majority's suggestion that Miller Bros. Co. v Maryland (supra) is essentially irrelevant (majority opn, at 175, n 2). Miller required the demonstration of "some definite link, some minimum connection, between a state and the person * * * or transaction it seeks to tax" (347 US, at 344-345), and the Supreme Court ruled not to allow the imposition of the use tax on the Delaware merchandiser (Miller Bros. Co. v Maryland, 347 US 340, 340-345, supra). The case rests on a different analysis of economic exploitation of consumer markets. Thus, it retains its vitality, relevance and analogous usefulness to the distinct analysis and disposition of the instant case.
The following cases are also important to scan the full landscape. In National Geographic v California Equalization Bd. (430 US 551 [1977]), the Supreme Court held that the State of California's imposition of a use tax liability on the Society's mail-order operation did not violate the Commerce Clause, since the Society had two offices in the State of California and "activities there adequately establish[ed] a relationship or `nexus' between the [magazine] and the State" sufficient to support the tax (id., at 556). Similarly, in Standard Steel Co. v Washington Revenue Dept. (419 US 560), the State of Washington's imposition of a tax levied on Standard's unapportioned gross receipts of sales made to Boeing Company, in Seattle, was not repugnant to the Commerce Clause, since one of Standard's employees maintained an office in the State of Washington (see also, Tyler Pipe Indus. v Department of Revenue, 483 US 232; Holmes Co. v McNamara, 486 US 24, 32). Furthermore, in Felt & Tarrant Co. v Gallagher (306 US 62, 64), the State of California sought to impose a use tax against an Illinois corporation. The Court upheld the imposition of the tax where the Illinois corporation had hired two general agents to solicit sales orders in California and contracted to pay the rent of a California office maintained for each agent (see also, Moorman Mfg. Co. v Bair, 437 US 267; General Motors v Washington, 377 US 436; accord, Nelson v Sears, Roebuck & Co., 312 US 359; Nelson v Montgomery Ward, 312 US 373 [no Commerce Clause violation where sellers maintained local retail stores in taxing State]).
Importantly, in the absence of an in-State plant or office, substantial nexus has been found to exist only when the *185 foreign vendor maintains "continuous local solicitation" within the taxing State (Scripto v Carson, 362 US 207, 211, supra [emphasis added]; Miller Bros. Co. v Maryland, 347 US 340, 346, supra; see, National Geographic v California Equalization Bd., 430 US 551, 557, supra; National Bellas Hess v Department of Revenue, 386 US 753, 757, supra). In Scripto, a Georgia corporation sold certain mechanical writing instruments to Florida residents. Scripto did not own or lease any office or plant in Florida. However, the corporation had written contracts with 10 sales "brokers," who were residents of Florida. The detailed contracts described the brokers as representatives of "Scripto for the purpose of attracting, soliciting and obtaining Florida customers." Although the salespeople were independent contractors, they provided Scripto with "continuous local solicitations in Florida," which satisfied the substantial nexus requirement (Scripto v Carson, 362 US 207, 211, supra).
The instant cases fall neither under Scripto nor National Geographic. The majority, we respectfully suggest, focuses too narrowly on the legal relationship between Scripto and its agents, rather than on the regularity and durational aspects of the agents' economic activities in the taxing State. The latter features are dispositive and key under the legal tests in Quill and Scripto. The Supreme Court expressly stated that the fact that "the `sales[people' were] not regular employees of [Scripto] devoting full time to its service" had no constitutional significance, because "[t]he test is simply the nature and extent of the activities * * * in [the taxing State]" (Scripto v Carson, supra, at 211-212 [emphasis added]). Highly significant in these cases involving our application of exclusively governing Supreme Court jurisprudence is the fact that the Supreme Court itself has repeatedly stated that Scripto v Carson (supra) "represents the furthest constitutional reach to date of a State's power to deputize an out-of-state retailer as its collection agent for a use tax" (National Bellas Hess v Department of Revenue, 386 US 753, 757, supra; see, Quill Corp. v North Dakota, 504 US 298, 306, supra). We believe that the instant cases go "further".
Relevantly, in General Trading Co. v State Tax Commn. (322 US 335), a Minnesota corporation, which maintained no office or place of business in Iowa, solicited sales in Iowa by salespeople from headquarters in Minnesota where the goods were shipped by common carrier into Iowa. The United States Supreme Court made no mention in the decision of the number *186 of salespeople or the regularity of their excursions to solicit sales in Iowa. However, in referencing the facts of General Trading in a Due Process Clause case, Miller Bros. Co. v Maryland (347 US 340, 346, supra), the Supreme Court noted "[t]hat was the case of an out-of-state merchant entering the taxing state through traveling sales agents to conduct continuous local solicitation * * * the only nonlocal phase of the total sale being acceptance of the order" (emphasis added). Indeed, it was the absence of continuous local solicitation which led the Supreme Court in Miller Bros. (supra) to hold that the State of Maryland could not impose the duty to collect a use tax on a Delaware merchandising corporation, although Miller made occasional deliveries into Maryland.
These precedents, taken together, in our respectfully tendered view, provide no constitutional hook to sustain the imposition of sales and use taxes assessed against these two Vermont vendors. The Tax Appeals Tribunal acknowledged that neither vendor maintained, leased or owned any office, distribution house or any other place of business in New York; nor do they own any tangible property, real or personal in New York; nor do they have a telephone listing in New York; nor do they have any agents or representatives stationed in New York. They, thus, have not provided New York with the key to the tax coffers box  a substantial nexus to New York by their activities here.
Orvis Company, Inc. submitted two affidavits to rebut the imposition of the use tax. The first affidavit, dated November 16, 1990, was signed by Leigh H. Perkins, president of the Orvis Company, Inc. Perkins stated that employees of Orvis' wholesale division visited New York retailers on a "sporadic, irregular basis." The purpose of the visits was to communicate with the retailers about problems in shipments, questions regarding display of the product, and to inspect the establishments of retailers selling Orvis products. Lastly, Perkins stated that "[t]he purpose of these visits was not to solicit sales to retailers nor to obtain purchase orders from the retailers."
The second affidavit, dated November 19, 1990, was signed by Thomas S. Vaccaro, a vice-president and the treasurer of the Orvis Company, Inc. Vaccaro's affidavit repeated many of the same facts set forth in Perkins' affidavit, but also attached a worksheet depicting the number of trips in New York State taken by Orvis Company, Inc. wholesale division employees *187 during the assessment period, September 1, 1977 through August 31, 1980. During the 36-month assessment period, Orvis' employees made 12 trips to New York. The State relies on a letter signed by Vaccaro, dated March 27, 1981. In that letter, Vaccaro stated that "[s]ome salesmen who reside in Vermont travel into New York to call on non-Orvis owned stores. The salesmen in no way bind the Orvis Company; all orders are approved in Vermont."
The letter and affidavits honestly acknowledge Orvis' de minimis, fleeting dashes into New York State. This is not the stuff of a cognizable, constitutional threshold called "substantial nexus," absent any of the other physical presence features of "continuous local solicitation" (Scripto v Carson, 362 US 207, 211, supra [emphasis added]; Miller Bros. Co. v Maryland, 347 US 340, 346, supra). Orvis' New York drop-ins look very much like Miller's occasional deliveries into Maryland (see, id.), and amounted to nothing more than a "slight [ ] presence" in New York (National Geographic v California Equalization Bd., 430 US 551, 556, supra [emphasis added]).
Likewise, Vermont Information Processing, Inc. had no employees in New York, did not employ salespeople to travel into New York to solicit sales, nor did it advertise in New York or engage in direct mail solicitation. Most of VIP's customers heard about VIP's products through word-of-mouth, and it was VIP's policy to invite interested parties to Vermont for demonstrations. If a customer decided to purchase VIP's services, VIP would send a contract by United Parcel Service. The final product, whether it was an entire computer hardware system or simply computer software, was shipped to the customer via common carrier. VIP's customers were usually trained to use the programs developed for them at VIP's headquarters in Vermont. VIP's personnel were available to customers by telephone to resolve problems. In addition, if software modifications were required, VIP installers were able directly to access a customer's computer from VIP's own computer system in Vermont through the use of a modem. In fact, during the entire assessment period, December 1, 1983 through November 30, 1986, VIP personnel made at most 41 visits to New York to service existing clients, never to solicit new customers. In our view, VIP's relatively occasional sojourns into New York State cannot represent anything more than a slight physical presence, and surely do not qualify as "continuous local solicitation." VIP, like Orvis, lacked continuous *188 presence in New York, which is the sine qua non of the "substantial nexus" test.
These businesses evidently tried to conform their business practices to legitimately avoid incurring multistate taxation in accordance with the teaching of Quill (Quill Corp. v North Dakota, 504 US 298, 309-317, supra). Despite their best efforts, they are now snagged by the ever-widening net that unsettles expectations, discourages investment and legitimate interstate commercial intercourse and tears at the mantle of Commerce Clause protection.
In sum, the "nature and extent of the activities" (Scripto v Carson, 362 US 207, 211, supra) of these two Vermont vendors are less "substantial" than all previous cases where "substantial nexus" has been found to exist. If the minimal forays in these cases are sufficient for New York to tax these businesses, so, too, can every other State, municipality and political subdivision throughout the Nation for minimally qualifying conduct (National Bellas Hess v Department of Revenue, 386 US 753, 759, supra). Finally and intuitively, these cases present an interesting contradiction in the facts of their minimal conduct and the law of substantial nexus.
In Matter of Orvis Co. v Tax Appeals Tribunal: Judgment modified, with costs to appellant-respondent Commissioner, and matter remitted to the Appellate Division, Third Department, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.
In Matter of Vermont Information Processing v Tax Appeals Tribunal: Judgment reversed, with costs, and petition dismissed.
NOTES
[1] Matter of Orvis Co. v Tax Appeals Tribunal, 204 AD2d 916; Matter of Vermont Information Processing v Tax Appeals Tribunal, 206 AD2d 764.
[2] Because minimum physical presence in the taxing State is no longer required to support jurisdiction to tax under the Due Process Clause, the authority of Miller Bros. Co. v Maryland (347 US 340), a pure due process case  heavily relied upon by the dissent  is considerably weakened.
[3] A form letter Orvis sent to retail establishments showed that Orvis extended credit to wholesale purchasers and that it imposed a "minimum stocking order of $3000" upon its wholesale customers. This evidence supports the conclusions (1) that the wholesale orders from sales solicitations in New York (admitted in Orvis' March 1981 letter) were indeed substantial, and (2) Orvis, in extending credit to New York wholesale purchasers, necessarily relied upon and utilized the banking and legal systems of this State.